FORBES INC. and William P. Barrett

v.

GRANADA BIOSCIENCES, INC. and Granada Foods Corporation.

No. 01–0788.

Supreme Court of Texas.

Argued on Jan. 15, 2003.

Decided Dec. 19, 2003.

Peter D. Kennedy, David H. Donaldson Jr., George & Donaldson, L.L.P., Austin, for petitioner.

Michael D. Sydow, Ralph S. Carrigan, Sydow, Kormanik, Carrigan & Eckerson, L.L.P., Houston, for respondent.

Thomas S. Leatherbury, Vinson & Ekins, L.L.P., Dallas, for amicus curiae.

Justice O'NEILL delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice HECHT, Justice OWEN, Justice JEFFERSON, Justice SMITH, Justice WAINWRIGHT, and Justice BRISTER joined.

Granada Biosciences, Inc. and Granada Foods Corporation sued Forbes, Inc., publisher of *Forbes* magazine, and writer William P. Barrett for business disparagement. The trial court rendered summary judgment for *Forbes* and *Barrett*, and the court of appeals reversed. 49 S.W.3d 610. We hold that the court of appeals erred in reversing the trial court's summary judgment because the plaintiffs produced no evidence that Forbes and Barrett acted with actual malice in publishing the article that is the subject of this controversy. Accordingly, we reverse the court of appeals' judgment and render judgment for Forbes and Barrett.

**I**

In its issue dated November 11, 1991, Forbes published an article entitled "The Incredible Shrinking Empire."[1] The article, authored by Barrett, focused on the financial condition of the Granada Corp., a privately held company, and on its chairman, David Eller. Granada Corp. was the parent of a number of other private and public entities. While the Granada organization consisted of dozens of entities, the article only named two of the public entities, Granada Foods Corp. (GFC) and Granada Biosciences, Inc. (GBI). In general, the Granada entities were engaged in developing and applying advanced technology in the area of agriculture, primarily cattle production. The article noted that the *Wall Street Journal* had described Granada Corp. as a "corporate star[ ] of the future" in 1989, and that the organization, under Eller's stewardship, had garnered much favorable publicity. But, the article said, "there is less to Granada than meets the eye. Actually, its total revenues, $1 billion as recently as 1988, will scarcely be $200 million for 1991. Profits: zilch. Granada's work force has shrunk to below 900 from 2,200; its cattle herd has dwindled to 25,000 from 1 million." The article identified GFC and GBI as the two publicly traded stock companies within the Granada organization, and said that they were "so broke they haven't been able to publish their 1990 annual reports." It went on to say that "Granada is beset with a series of serious shareholder lawsuits," including one filed by "Fort Worth near-billionaire Edward Bass." It is undisputed that, while a person with that name had sued one of the Granada entities, it was not the "Fort Worth near-billionaire." Furthermore, the article described a number of other signs of serious financial trouble: "Possibly anticipating a bankruptcy filing, former Granada employees say officials in recent months have moved some farm equipment and vehicles off Granada books and gotten rid of backup documentation."

According to Barrett's affidavit, he used the term "Granada" in a generic sense to describe the various entities controlled by Eller, and when he "intended to specifically address Granada Biosciences, Inc. or Granada Food Corporation, [he] did so by

1. The article is attached as an Appendix to this opinion.

name." The day the article was released, the shares of GBI and GFC dropped precipitously, and trading was permanently suspended in early 1992.

GBI, GFC, Eller, and his wife, Linda, sued Barrett, Forbes, Inc., and Cheryl Munke, an employee of a former Granada affiliate, for damages allegedly caused by the article's publication. Forbes and Barrett (collectively "Forbes") filed joint motions for summary judgment, which the trial court granted. On appeal, the Seventh District court of appeals, to which the case was transferred, reversed, holding that Forbes's summary judgment motion did not address the plaintiffs' business disparagement claims. *Granada Biosciences, Inc. v. Barrett,* 958 S.W.2d 215, 221 (Tex. App.-Amarillo 1997, pet. denied).[2] On remand, Forbes filed a renewed and supplemental summary judgment motion under Rule 166a(c) and(i), which specifically addressed the plaintiffs' business disparagement claims. The trial court again granted summary judgment in Forbes's favor, but the Fourteenth District court of appeals reversed, concluding that several fact issues precluded summary judgment. The court determined that there were fact issues concerning whether the article as a whole and several specific passages in the article were false and disparaging. 49 S.W.3d at 621–22. The court agreed with Forbes's contention that, to recover on their business disparagement claims, the plaintiffs were required to satisfy the constitutional actual-malice standard the United States Supreme Court established in *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), but held that a fact issue on Forbes's state of mind at the time of publication precluded summary judgment. We hold that GBI

and GFC presented no evidence of actual malice under the *New York Times* standard, and thus reverse the court of appeals' judgment.

## II

To prevail on a business disparagement claim, a plaintiff must establish that (1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff. *Hurlbut v. Gulf Atl. Life Ins. Co.,* 749 S.W.2d 762, 766 (Tex.1987). A business disparagement claim is similar in many respects to a defamation action. *Id.* The two torts differ in that defamation actions chiefly serve to protect the personal reputation of an injured party, while a business disparagement claim protects economic interests. *Id.* In *Hurlbut,* a suit brought by an insurance agent against his former employer, we noted that a business disparagement defendant may be held liable "only if he knew of the falsity or acted with reckless disregard concerning it, or *if he acted with ill will or intended to interfere in the economic interest of the plaintiff in an unprivileged fashion."* *Id.* (emphasis added) (quoting RESTATEMENT (SECOND) OF TORTS § 623A, cmt. g (1977)).

The court of appeals noted in this case that GBI and GFC did not dispute Forbes's contention that they were "public figures for the purpose of discussing their respective financial statuses," a conclusion that GBI and GFC do not challenge here. 49 S.W.3d at 615 n. 2. The court then held that ill will or intent to interfere with the plaintiff's economic interest will not suffice to establish malice in a business disparagement claim brought by a public figure

---

**2.** The Amarillo court affirmed the summary judgment as to all claims against Munke, and she is no longer a party. *Granada Biosci-*

*ences, Inc.,* 958 S.W.2d at 222. It also affirmed the summary judgments as to the Ellers' claims. *Id.* at 222–25.

against a media defendant. *Id.* at 618. Instead, the court held that the constitutional interests at stake—"the conflict between constitutionally-protected free expression and a state's power to award damages based on a defendant's statements"—require proof of actual malice under the standard the United States Supreme Court articulated in *New York Times*. *Id.* at 618. Accordingly, the court held that GFC and GBI must establish that Forbes published the article with knowledge that it made false statements about them, or with reckless disregard as to the statements' truth. *Id.* In this Court, GBI and GFC do not challenge the court of appeals' application of the constitutional malice standard. We thus assume without deciding that the *New York Times* actual-malice standard applies in a public figure's business disparagement suit against a media defendant.[3]

### III

■ The actual malice standard articulated in *New York Times* fortifies our Constitution's guarantees of free speech and a free press. *New York Times*, 376 U.S. at 254, 84 S.Ct. 710. The relatively demanding standard honors our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks" on public figures. *New York Times*, 376 U.S. at 270, 84 S.Ct. 710. The standard recognizes that "erroneous statement is inevitable in free debate, and ... it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need ... to survive.'" *Id.* at 271, 84 S.Ct. 710 (quot-

ing *N.A.A.C.P. v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)). Thus, public figures cannot recover for damaging statements made about them absent proof of actual malice. *New York Times*, 376 U.S. at 279–80, 84 S.Ct. 710; *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex.1998).

■ Actual malice, in this context, "is a term of art." It is not ill will, spite, or evil motive. *Huckabee v. Time Warner*, 19 S.W.3d 413, 420 (Tex.2000) (citing *Casso v. Brand*, 776 S.W.2d 551, 558 (Tex.1989)). Instead, "actual malice" requires proof that the defendant made a statement " 'with knowledge that it was false or with reckless disregard of whether it was true or not.'" *Huckabee*, 19 S.W.3d at 420 (quoting *New York Times*, 376 U.S. at 279–80, 84 S.Ct. 710). To establish reckless disregard, a public-figure plaintiff must prove that the defendant " 'entertained serious doubts as to the truth of his publication.'" *Huckabee*, 19 S.W.3d at 420 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)). Reckless disregard is a subjective standard, focusing on the defendant's state of mind. *Bentley v. Bunton*, 94 S.W.3d 561, 591 (Tex.2002). Mere negligence is not enough. *Id.* Rather, the plaintiff must establish " 'that the defendant in fact entertained serious doubts as to the truth of his publication,'" or had a " 'high degree of awareness of ... [the] probable falsity' " of the published information. *Id.* (quoting *Harte–Hanks Comm., Inc. v. Connaughton*, 491 U.S. 657, 688, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989)). Constitutional malice generally consists of " '[c]alculated falsehood.'" *Bunton*, 94 S.W.3d at 591 (quot-

3. We note, however, that the United States Supreme Court has applied the *New York Times* standard in contexts other than defamation, applying it to an intentional infliction of emotional distress claim, *Hustler Magazine v. Falwell*, 485 U.S. 46, 56, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988), and to a product disparagement claim, *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 511–14, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

ing *Garrison v. Louisiana,* 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)). When the defendant's words lend themselves to more than one interpretation, the plaintiff must establish either that the defendant knew that the words would convey a defamatory message, or had reckless disregard for their effect. *See Bunton,* 94 S.W.3d at 603.

■ Actual malice must be proved by clear and convincing evidence at trial. *Huckabee,* 19 S.W.3d at 420. However, we have declined to adopt the clear-and-convincing standard for summary judgment purposes, because its application would "suggest[ ] that the trial court must weigh the evidence." *Id.* at 421–22. Accordingly, Forbes was entitled to summary judgment unless the record reveals a fact issue as to actual malice.

## IV

■ In its no-evidence summary judgment motion, Forbes asserted that there was no evidence of actual malice to support the plaintiffs' claims. *See* Tex.R. Civ. P. 166a(i). In reviewing a no-evidence summary judgment motion, we examine the record in the light most favorable to the nonmovant; if the nonmovant presents more than a scintilla of evidence supporting the disputed issue, summary judgment is improper. *King Ranch v. Chapman,* 118 S.W.3d 742, 750 (Tex.2003); *Wal–Mart Stores, Inc. v. Rodriguez,* 92 S.W.3d 502, 506 (Tex.2002). A no-evidence summary judgment is improper if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. Tex.R. Civ. P. 166a(i); *Wal–Mart,* 92 S.W.3d at 506. "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *King Ranch,* 118 S.W.3d at 751 (quoting *Kindred v. Con/Chem, Inc.,* 650

S.W.2d 61, 63 (Tex.1983)). More than a scintilla of evidence exists if it would allow reasonable and fair-minded people to differ in their conclusions. *King Ranch,* 118 S.W.3d. at 751 (citing *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997)). Thus, if *GBI* and GFC presented evidence creating more than a surmise or suspicion that Forbes published the article with actual malice, summary judgment is improper. The court of appeals concluded that fact issues about Forbes's state of mind at the time of publication precluded summary judgment. 49 S.W.3d at 627. We disagree.

### A

■ The court of appeals rested its decision, in large part, on evidence suggesting that Barrett misled Eller into believing that he would have an opportunity to review the article for accuracy before its publication. 49 S.W.3d at 626. In his affidavit, Eller stated that when Barrett first contacted him about writing the article, Barrett agreed to let him review it before it was published. On Friday, October 25, 1991, Eller received a copy of "what [Barrett] said was a draft of the article." According to Eller, he read the article that day and telephoned Barrett, telling him that the article "contained innumerable false statements and clearly misleading and false innuendos." Eller's affidavit maintains that he was misled in the conversation into believing that the article could still be corrected, and that he told Barrett he would send him a letter identifying the purported inaccuracies as quickly as possible. Eller transmitted the letter to a courier for delivery by late the next day. According to the court of appeals, this evidence "creates a fact question as to Barrett's state of mind at the time of publication, provided that the article was not published until *after* Barrett's

representation." *Id.* at 625 (emphasis added).

■ The actual malice inquiry focuses on the defendant's state of mind at the time of publication. *See Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 512, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). It is undisputed, however, that the article had been "locked up"—printed and mailed to subscribers— on October 21st, before Barrett's October 25th conversation with Eller and before Forbes received Eller's letter. Nevertheless, the court of appeals held that the record presented a fact issue on malice "[b]ecause the summary judgment proof raises a question as to whether the October 25 conversation took place *before the article was published.*" 49 S.W.3d at 627 (emphasis added). The court concluded that the conversation may have taken place before the article was published based on authority holding that, for limitations purposes, " 'publication is complete on the last day of the mass distribution of copies of the printed matter.' " *Id.* at 626 (quoting *Holloway v. Butler,* 662 S.W.2d 688, 692 (Tex.App.-Houston [14th Dist.] 1983, writ ref'd n.r.e.)).

The court of appeals erred in applying the *Holloway* limitations standard in this context. Determining the date of an article's publication for limitations purposes involves considerations entirely different from those that apply when gauging whether actual malice exists at the time of publication. In *Holloway,* the plaintiff sued for libel based upon an article that appeared in *Texas Monthly* magazine. 662 S.W.2d at 690. Like most mass-media publishers, the defendant distributed its magazine through the mail and by private delivery in the month prior to the month indicated on the issue cover. Accordingly, distribution of the March 1977 issue occurred on February 17 and 18, 1977. By special order, though, some back issues were sold after February 22, 1977. Plaintiff filed suit on February 22, 1978. In response to the defendant's assertion of limitations, the plaintiff relied on the "multiple-publication rule," which recognizes a new cause of action each time a copy of the allegedly libelous publication is sold. Noting that such a rule would allow stale claims, encourage multiple suits, and create a number of other problems, and recognizing that mass publication of a single defamatory statement constitutes, in effect, a single wrong, the court adopted what it referred to as the "single-publication rule." *Id.* at 691. Under the court of appeals' articulation of that rule, publication is complete "on the last day of the mass distribution of copies of the printed matter" because "[i]t is that day when the publisher, editors and authors have done all they can to relinquish all right of control, title and interest in the printed matter." *Id.* at 692. The court emphasized that defining publication in this manner "provides ample time for a diligent plaintiff to pursue a cause of action for libel and also allows full recovery for any damages suffered." *Id.*

The single-publication rule's definition of the publication date for limitations purposes is clearly designed to protect publishers from repeated liability based on old publications that might be reprinted or back ordered. *See* ROBERT D. SACK, SACK ON DEFAMATION: LIBEL, SLANDER, AND RELATED PROBLEMS § 7.2 (2003). It has nothing to do with determining the publisher's state of mind at the time of publication. Applying the single-publication rule in this context could lead to virtually uncontrollable liability and potentially absurd results. For example, a media defendant could be held liable for knowingly publishing false information even if it did not become aware of the error until the article has

been printed and mailed to subscribers or otherwise distributed. Such a result would have an impermissible " 'chilling' effect . . . antithetical to the First Amendment's protection of true speech on matters of public concern." *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 778, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) (holding that application of state law that did not require private media defamation defendant to prove falsity violated First Amendment). Moreover, the focus of the actual-malice inquiry is the defendant's state of mind during the editorial process. *See Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). Evidence concerning events after an article has been printed and distributed, has little, if any, bearing on that issue. Because the Forbes article was printed and in distribution before Eller's October 25th conversation with Barrett, the conversation cannot constitute evidence of actual malice at the time of publication.

**B**

During Barrett's October 25th conversation with Eller, he acknowledged that he had that day become aware that he had misidentified the Edward Bass that had sued one of the Granada entities.[4] GBI and GFC argue that this constitutes some evidence of actual malice. For the same reason that any misleading statements Barrett may have made in the October 25th conversation are no evidence of malice, his acknowledgment that he had become aware of the Bass error that day is no evidence of actual malice.

**C**

 Finally, the plaintiffs contend that the article made a number of negative statements about "Granada" that Forbes was aware were untrue as to GFC and GBI. By failing to specifically distinguish the public corporations from other entities within the Granada group, they argue, Forbes knowingly or recklessly juxtaposed true statements to create the misleading impression that they applied to GFC and GBI. They argue that Barrett's affidavit itself provides some evidence of malice because he testified that he used the term "Granada" to describe "the organization of subsidiaries, affiliates, limited partnerships, joint ventures and other business organizations that were managed or otherwise under the direction and control of David Eller," a group that includes GFC and GBI. Because Barrett also testified that certain of the generic Granada references were not intended to apply to GBI or GFC, the plaintiffs maintain that the article is admittedly false with respect to those statements. In essence, the plaintiffs contend that Forbes should have included qualifying language specifically excluding GBI and GFC whenever the article referred to "Granada."

Read fairly, Barrett's affidavit establishes, at most, that Forbes was " 'guilty of using imprecise language in the article—perhaps resulting from an attempt to produce a readable article.' " *Bose,* 466 U.S. at 492, 104 S.Ct. 1949 (quoting *Bose Corp. v. Consumers Union of United States, Inc.,* 692 F.2d 189, 197 (1st Cir.1982)). Both we and the United States Supreme Court have repeatedly held that a media defendant's poor choice of words or content, without more, does not amount to actual malice.

In *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103 (Tex.2000), for example, we considered a political candidate's contention that a television news story suggesting that he had participated in a multi-million dollar insurance scam defamed him.

---

4. The error was corrected in a later issue of the magazine.

Turner had drafted a will for a man named Foster shortly before Foster disappeared under suspicious circumstances. Foster, the target of several criminal investigations, signed the will three days before he was reported to have drowned. Foster's life had been insured for more than $1.7 million, and American authorities learned some time later that he was alive in a Spanish prison. KTRK, a Houston television station, broadcast a story about the connection between Turner and Foster in the midst of Turner's campaign for mayor of Houston. The story omitted several critical contextual facts and juxtaposed others in a misleading manner in the course of suggesting that Turner had engaged in unethical conduct. We therefore held that the broadcast as a whole conveyed a false and defamatory message. *Id.* at 119. But we rejected Turner's contention that the story's discussion of the timing of his work on the will was evidence of actual malice. *Id.* at 121. We agreed that a reasonable viewer could take the segment to mean that "Turner 'drew up' the will three days before Foster disappeared." *Id.* But we concluded that even obviously misleading statements, without more, were not enough to constitute clear and convincing evidence of actual malice:

> We agree that there was a discrepancy in the segment's language and that it is possible that [the reporter] cleverly manipulated this language to deceive viewers. But it is equally possible that [the reporter] simply failed to choose his words with proper precision, that is, by stating that Foster "drew up" rather than "signed" the will (outside of Turner's presence) three days before he disappeared. Because there is no other evidence that [the reporter] knew or strongly suspected that this segment would mislead viewers, its lack of clarity alone is not clear and convincing evidence of actual malice.

*Id.* at 121–22.

In *Huckabee,* we affirmed summary judgment granted to a media defamation defendant that had been sued for statements in a documentary about four southeast Texas cases in which family courts granted custody of a child to the father after the mother accused him of child abuse. *Huckabee,* 19 S.W.3d at 417. One of the judges who presided over two of the custody disputes sued Time–Warner, alleging that the documentary omitted key information in an effort to depict him as biased or corrupt. We acknowledged that a publisher might present such an incomplete or unbalanced picture of the facts as to constitute evidence of actual malice. *Id.* at 426. On the facts of that case, however, we held that the record presented no evidence of actual malice, even though the story might have been misleading:

> Although the facts omitted might or might not have led a reasonable viewer to suspend judgment or even to reach an opposite conclusion regarding Judge Huckabee's order, their omission did not grossly distort the story. At most, HBO's failure to capture accurately all the story's details suggests an error in judgment, which is no evidence of actual malice.

*Id.*

Similarly, in *Bose,* the Supreme Court considered a manufacturer's claim that a *Consumer Reports* article describing a new Bose speaker system disparaged the product. The district court had ruled that the article falsely stated as fact that "instruments heard through the *Bose* system 'tended to wander about the room,'" and rendered judgment for Bose, the manufacturer. *Bose,* 466 U.S. at 488, 104 S.Ct. 1949. Applying the *New York Times'* actual-malice standard, the Supreme Court

rendered judgment for the publisher. The Court observed that the circuit court correctly concluded "that there is a significant difference between proof of actual malice and mere proof of falsity." *Id.* at 511, 104 S.Ct.1949 (citations omitted). The district court had found that the writer's actual perception was that sound moved "along the wall" rather than "about the room." *Id.* Nevertheless, the Court held that the writer's choice of language,

> though reflecting a misconception, does not place the speech beyond the outer limits of the First Amendment's broad protective umbrella.... The statement in this case represents the sort of inaccuracy that is commonplace in the forum of robust debate to which the *New York Times* rule applies.... "Realistically, ... some error is inevitable; and the difficulties of separating fact from fiction convinced the Court in *New York Times* [and other cases] to limit liability to instances where some degree of culpability is present in order to eliminate the risk of undue self-censorship and the suppression of truthful material."

*Id.* at 513, 104 S.Ct. 1949 (citations omitted).

Here, Barrett was charged with the task of producing a readable article about an extremely complicated network of business entities related to the Granada Corp. While it would have been more accurate for Forbes to identify the precise entities within that group to which it was referring, Forbes's careless use of the generic "Granada" is no evidence that Forbes entertained serious doubts as to the statements' truth or had a high degree of awareness of their falsity. *See Turner*, 38 S.W.3d at 121.

## V

The record before us presents no evidence that Forbes published defamatory statements about GBI and GFC with actual malice. Accordingly, we reverse the court of appeals' judgment and render judgment that the plaintiffs take nothing.

Justice SCHNEIDER did not participate in the decision.

# APPENDIX: Forbes article

**Houston's Granada Corp. talks of 1991 revenues of $2 billion. Try $200 million. This much-touted high-tech food concern is near collapse.**

# The incredible shrinking empire

By William P. Barrett

IN 1989 THE *Wall Street Journal* included Granada Corp. among its "corporate stars of the future." The newspaper cited the research by this Houston-based parent of several public and private entities into cattle cloning and embryo transfers. The plug was but one more triumph in the relentless and largely successful quest for publicity by David Eller, Granada's chairman and chief executive. Newer news clippings, which Granada's press agents still hand out, call Granada a $1 billion organization. In mid-October a Granada executive told FORBES that revenues this year would reach $2 billion.

But there is less to Granada than meets the eye. Actually, its total revenues, $1 billion as recently as 1988, will scarcely be $200 million for 1991. Profits: zilch. Granada's work force has shrunk to below 900 from 2,200; its cattle herd has dwindled to 25,000 from 1 million.

There are two publicly traded stock companies within the Granada organization, Granada Foods (1990 revenues, $149 million) and Granada BioSciences ($16 million). They are so broke they haven't been able to publish their 1990 annual reports. The Granada organization is vacating the Houston headquarters building it co-owns with the Eller family so the property can be sold to satisfy the mortgage holder. In addition, Granada is beset with a series of serious shareholder lawsuits.

Granada is yet another case of the media and many investors taking exaggerated claims at face value. In 1972 David Eller, now 53, and his brother James, 59, founded Granada

Granada's David Eller
No money to print the annual report.

Corp., which they still own 50-50. Stated purpose: to bring high technology to the ancient craft of farming, mainly cattle farming. Indeed, starting in the late 1970s Granada earned a reputation for research into ways of transferring bovine embryos and cloning the perfect cow. The idea was that genetically engineered cattle would produce more meat or milk cheaper.

From 1975 on, the outfit was largely financed by tax-sheltered limited partnerships. A petroleum engineer by background, with an easy, genial demeanor, David Eller proved to be one terrific salesman. In a series of five limited partnerships formed from 1981 to 1986, he raised $249 million. These interests were later rolled over—without a vote of limited partners—into Granada Foods and Granada BioSciences, still majority-owned by the Ellers.

Today that $249 million in public

money has a market value of only $26 million. The development cost of all this whiz-bang technology proved to be so expensive that old-fashioned cattle breeding techniques, including artificial insemination, were a lot cheaper. Granada's overhead was also quite high. "We got science conquered, but our efficiencies were very poor," Eller concedes.

Granada lost an estimated $30 million speculating in cattle commodities, then couldn't sell off its own stock profitably. Plans to set up a vertically integrated operation including eateries and retail stores foundered. And a large amount of funds was drained off into the Eller family through management fees and transactions with enterprises it controlled. The big 1986 changes in the tax laws cut off the flow of new funds into the Granada partnerships because they removed most of the tax incentives for investing in them.

Yet even while its affairs were deteriorating, Granada managed to hide the facts from the outside world. How? Through its complex corporate structure, which involved a score of interlocking entities, most of them private. Their dealings with one another exaggerated Granada's actual revenues. The partners did not know the overall picture.

What they did know was that David Eller was a prominent figure in Houston's celebrity world. He and his wife, Linda, a Granada official who was just voted Houston Business Woman of the Year, were frequently featured on the society pages and photographed for posh national magazines like *Town & Country*. Eller served four years as the board chairman of his alma mater, Texas A&M University, where a building is named after him.

But now the image is fraying fast. According to their latest filings, Granada Foods (recently trading at 5⅛) and Granada BioSciences (recently 6¼) are losing money and have negative cash flows from operations. Recently laid off employees—even ten-year veterans—got only two weeks' severance plus vacation. Many vendors have Granada on a C.O.D. basis. Last year Granada BioSciences announced executives had bought $300,000 of stock with company loans, a seeming vote of confidence.

Granada Corp.

Only later did it become known that the company would cover any losses.

Eller's team is scrambling for fresh funds to keep going—really scrambling. In mid-September, according to Houston deed records, a Granada Foods subsidiary got a $2 million bank loan—but only after the Eller family signed personal guarantees and also posted some unrelated collateral. Attempts by Granada to find joint venture partners have been unsuccessful. Even Texas A&M balked at supporting a bond issue that would have helped Granada. Contracts selling goods or technology to foreign buyers, announced by Granada Bio-Sciences amid much hoopla, have generated little money.

In a Houston court pleading this summer, one Granada entity acknowledged huge unpaid legal bills—a virtual admission of insolvency. Not surprising. A half-dozen serious lawsuits are moving toward trial, filed by disgruntled Granada investors claiming Eller and others misled them over the years or siphoned off assets. One investor lawsuit accuses Granada of touting tax-writeoff advantages while aware the Internal Revenue Service had successfully challenged deductions by individual taxpayers. Among the many people suing Granada is Fort Worth near-billionaire Edward Bass. Granada responds it has done nothing wrong.

Possibly anticipating a bankruptcy filing, former Granada employees say officials in recent months have moved some farm equipment and vehicles off Granada books and gotten rid of backup documentation. Eller denies any improprieties. But this is not exactly unheard-of stuff at Granada; in the course of continuing litigation, a Granada employee admitted under oath that he signed back-dated loan and corporate documents at the direction of superiors. Other embarrassing documents have also surfaced.

Don't write Granada off—completely. You can't rule out that some larger company will buy part or all of the Granada organization, or that Eller will find foreign joint venture partners with deep pockets. David Eller is one resourceful man. But his unfortunate fellow shareholders can kiss most of their original investment good-bye. ■