

NUMBER 13-10-00238-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

D. CHRISTOPHER PETERSON, INDIVIDUALLY AND
AS ADMINISTRATOR OF THE ESTATE OF
MATTHEW C. PETERSON, DECEASED AND
JUDITH PETERSON,                                                    Appellants,

v.

RES AMERICA CONSTRUCTION, INC.,
RENEWABLE ENERGY SYSTEMS
AMERICAS, INC. ("RES-A")
AND RES (CONSTRUCTION), L.P. ("RES-C").,                            Appellees.

On appeal from the 148th District Court
of Nueces County, Texas.

# MEMORANDUM OPINION

Before Justices Garza, Vela and Perkes
Memorandum Opinion by Justice Garza

Appellants, Christopher D. Peterson, individually and as administrator of the

estate of Matthew C. Peterson, deceased, and Judith Peterson, challenge the trial court's summary judgment dismissing their wrongful death suit against appellees, RES America Construction, Inc. ("RES-AC"), Renewable Energy Systems Americas, Inc. ("RES-A") and RES (Construction), L.P. ("RES-C").[1] By two issues, appellants contend that they raised fact questions as to their premises liability and negligence claims. We affirm.

## I. BACKGROUND

Matthew Peterson, an employee of DNV Global Energy Concepts, Inc. ("DNV"), was working in 2008 at a wind farm being constructed on a portion of the Kenedy Ranch in Sarita, Texas. RES served as the general contractor overseeing construction at the wind farm, and DNV had contracted with RES to build meteorological towers ("met towers") at the site. On or about November 9, 2008, Peterson and a co-worker entered the ranch in order to install a guyed boom on sections of one of the towers. Peterson climbed the tower to a height of approximately eight feet in order to install an anemometer[2] on the guyed boom. However, the tower was not properly located, nor was it properly anchored to the ground or stabilized. As a result, the tower fell and pinned Peterson to the ground, causing him to suffer severe injuries, and ultimately causing his death.

Appellants, Peterson's parents, filed a wrongful death suit against RES and several other defendants.[3] The Petersons claimed that RES was a "possessor" of the

---

[1] All three appellees will be referred to collectively as "RES."

[2] An anemometer is an instrument used to measure the force or speed of wind. MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 44 (10th ed. 1996).

[3] The other named defendants are: Ionos Communications; SNET, L.L.C. d/b/a Southern Networks and Southern Networks, L.L.C.; Richard Elizondo d/b/a Ionos Communications; AJM Group,

2

wind farm site at the time of their son's accident, and therefore, RES "exercised control" over the premises and was liable under a premises liability theory. They further asserted a traditional negligence claim, as well as a claim of negligent undertaking. Under the latter theory, the Petersons alleged that RES "voluntarily or gratuitously . . . undertook (1) the job of building the road that led to the subject met tower staging area and (2) site safety." The Petersons claimed that RES knew or should have known that these services were "necessary" for their son's protection, that Matthew relied upon RES's performance of these services, and that RES failed to exercise reasonable care in performing those services. More specifically, the Petersons alleged that "[t]he road was built with defects, which defects directly led to the unsafe placement of the subject tower section in the soft, sandy wetlands area."

RES subsequently answered the suit and filed two "hybrid" motions for traditional and no-evidence summary judgment.[4] In the first motion, RES-AC and RES-A contended that: (1) RES was not the possessor of the premises; (2) RES "played no role in causing and/or contributing" to the creation of a condition on the premises posing an unreasonable risk of harm to Peterson; (3) RES had no actual or constructive knowledge of any such condition; and (4) RES owed no legal duty to Peterson and breached no such duty. In support of their motion, RES-AC and RES-A pointed to a contract dated February 15, 2008, between RES-C and Gulf Wind LLC ("Gulf Wind"). According to the summary judgment motion, because the contract demonstrated no legal relationship between RES-AC or RES-A with Gulf Wind, the owner of the site at

---

LLC; Arnold Quintanilla d/b/a AJM Group, LLC; and Gravitec Systems, Inc. None of these entities are parties to this appeal.

[4] One of the hybrid summary judgment motions was filed by appellees RES-AC and RES-A; the other was filed by appellee RES-C.

3

issue, those two RES entities were entitled to summary judgment. In the second hybrid summary judgment motion, RES-C claimed that there was no evidence for the Petersons' claims and argued further that the construction of met towers was explicitly excluded from the contract's definitions of the "Project" at issue and RES's "Scope of Work" with respect to the project.[5] Therefore, according to RES, it owed no duty to Peterson and was entitled to traditional summary judgment.[6]

The Petersons filed a response to the first summary judgment motion arguing that RES was a "possessor" of the site, that RES controlled the details of the work of

---

[5] The contract defined the "Project" as:

> the integrated wind-powered electric generating facility . . . to be located on the Project Site, consisting of all foundations, structures, facilities, appliances, lines, [t]ransformers, WTGs [wind turbine generators], conductors, instruments, equipment, apparatus, components, roads and other property comprising and integrating the entire facility described generally in the Scope of Work and the Technical Specifications.

The "Scope of Work" was defined as

> the services and work to be provided, or caused to be provided, by or through [RES-C] under this Agreement for the Contract Price, as more specifically described in Exhibit A and the Technical Specifications, as the same may be amended from time to time in accordance with the terms hereof.

Part A of Exhibit A to the agreement listed specific tasks that are included in the scope of work. Part B of Exhibit A states that, "[n]otwithstanding any conflicting statement in Part A of Exhibit A or elsewhere in the Agreement, the following items are not included in [RES-C]'s Scope of Work," and includes the following:

18.      CONTRACTOR EXCLUSIONS – MET MASTS/POWER CURVE TESTING

18.1    General

(i)      Procurement and installation of met masts and instrumentation needed for the temporary and permanent metrological [sic] towers.

(ii)     Temporary power to met masts

(iii)    Site calibration

(iv)    Power curve testing

(v)     Met tower FAA lights

[6] This argument, regarding the definition of RES's "Scope of Work," was also advanced by RES-AC and RES-A in the first summary judgment motion.

4

subcontractors, that it failed to warn of a dangerous condition, and that it undertook to perform work at the site. The Petersons attached several deposition transcripts to their response[7] in support of their contention that fact issues existed on their causes of action against RES. One of those depositions was by Robert Elizondo, a forklift operator employed by Ionos Communications ("Ionos"), which was DNV's subcontractor in charge of, among other things, determining where to place the met towers. Elizondo stated he participated in the staging of the tower section which eventually collapsed and caused Peterson's death. Elizondo agreed that, when the tower section was lowered into place, he noticed that it "s[a]nk, to some extent, in the soft sand" underneath. Elizondo stated that the path leading to the erection site was initially "sand, soft sand, and we couldn't drive equipment or trucks out to the site because the sand was so soft." Elizondo contacted a colleague at Ionos, "and he contacted RES, and they sent operators and equipment out there and installed a small caliche road." However, "[t]he road was small, narrow, and we deemed [it] insufficient for supporting the weight of the crane that was to be coming in." According to Elizondo, the condition of the road was the reason that the tower section was eventually placed in soft sand:

| Q. [Petersons' counsel] | Okay. So as you're going down the road with this tower section and you're going to stage it, how do you decide that you want to put it in that particular location? |
|---|---|
| A. [Elizondo] | It was just—at that point, we already knew the viability of the road was bad. We were going to have problems. So we just set it on the left-hand side, out of the way. |

John Bruce, an RES representative, testified that a request was made to him to

---

[7] Many of these deposition transcripts, as they appear in the record before this Court, are missing critical pages. Moreover, several of the transcripts appear to have pages cobbled together haphazardly from different depositions. We will consider the deposition transcripts in our analysis only insofar as we can make sense of them.

"form an access road to the met mast." After the request was made, Bruce instructed another RES employee, Tony LePape, to hire Ballenger Construction Co. ("Ballenger") to construct the road. Andrew Fowler, RES's senior vice president for construction, acknowledged that RES supervised the road construction and that this construction was critical to other work being done on the site:

> Q. [Petersons' counsel]  Did RES supervise the construction of the roads?
>
> A. [Fowler]  Yes.
>
> . . . .
>
> Q.  Would it be correct to say that a lot of the work done out there is dependent upon the roadwork that takes place?
>
> A.  Yes.
>
> Q.  You got—roads are part of the infrastructure and you got to get your infrastructure in place before you can start putting up your turbines?
>
> A.  Yes.

Fowler also stated that "wetland areas were demarcated throughout the site and we instructed our subcontractors not to go in the wetlands."

Peterson further argued in his response that RES exercised "substantial control over the premises and the work details of the many companies at the site." In support of this contention, Peterson pointed to a "Site Passport" issued by RES which provided dozens of rules and regulations required to be obeyed by workers on the site. Those rules included the following:

> 3)  All climbing and lifting equipment must be inspected every day before use and defective equipment replaced immediately.
>
> . . . .

7) All traffic must stay on designated roads and rights-of-way. Do not turn around or back into grass areas unless clearly marked by clearing stakes. DO NOT drive outside clearing limits, and stay away from sensitive areas such as wetlands and sand dunes.

. . . .

21) All personnel must attend site safety "tailgate talks" with their employers at least once a week; these meetings must be documented on a record sheet.

. . . .

28) RES operates a "Three Strikes" rule for safety violations: Verbal, Written, and Dismissal. Major violations, such as violence (or threat thereof) towards others, drug or alcohol abuse and/or willful negligence will result in violators being immediately removed from site without warning. RES management will determine what constitutes a major violation.

. . . .

33) All work crews must carry the emergency contact information and a cell phone or 2-way radio for safety. Nobody shall ever be unable to reach others for help.

. . . .

36) All near misses and accidents must be reported to the RES office immediately and preventative measures taken to stop the incident from reoccurring. This includes damage to ranch property, or accidents with livestock or wild game.

The Petersons note that minutes from a "Site Safety and Environment Meeting" held at the Gulf Wind project site on October 22, 2008, indicated that all workers on site were instructed to "[s]tay off all wetlands unless authorized by RES" and that all subcontractors needed to "identify staging areas at each work site." Additionally, RES operated an "Illness and Injury Prevention Program" which was explained in a document attached as an exhibit to the main contract with Gulf Wind. According to that document, RES site safety inspectors are required to "[b]ring to the attention of subcontractors any

7

activities that present a hazard to their own personnel, other personnel, operatives or the general public." The Petersons contend that, in the instant case, RES's site safety inspector did not comply with this policy.

Finally, the Petersons attached to their response a work permit issued by RES to Ionos, entitled "Permit to Excavate," dated January 30, 2009, and signed by Gary Kriegel, an RES representative. The permit stated: "I have checked that all precautions have been taken to ensure the safety of the excavation work detailed above. I consider it safe to carry out the work between the times and dates specified."

The trial court granted RES's summary judgment motions without stating the grounds upon which they were granted. Peterson's causes of action against RES were severed from his causes of action against the other defendants, and he filed this appeal.

## II. DISCUSSION

### A. Standard of Review

A motion for summary judgment may be brought on no-evidence or traditional grounds. *See* TEX. R. CIV. P. 166a(c), (i). A motion for no-evidence summary judgment is equivalent to a motion for pretrial directed verdict, and we apply the same legal sufficiency standard on review. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006); *Ortega v. City Nat'l Bank*, 97 S.W.3d 765, 772 (Tex. App.—Corpus Christi 2003, no pet.) (op. on reh'g); *Moore v. K Mart Corp.*, 981 S.W.2d 266, 269 (Tex. App.—San Antonio 1998, writ denied). Such a motion should be granted if there is no evidence of at least one essential element of the plaintiff's claim. *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) (per curiam). The burden of producing evidence is entirely on the non-movant; the movant has no burden to attach any evidence to the motion, and if the non-movant produces evidence raising a genuine issue of material fact, summary

8

judgment is improper. TEX. R. CIV. P. 166a(i). All that is required of the non-movant is to produce a scintilla of probative evidence to raise a genuine issue of material fact on the challenged element. *Forbes, Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 172 (Tex. 2003); *Ortega*, 97 S.W.3d at 772. "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion of a fact.'" *Ortega*, 97 S.W.3d at 772 (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)); *see Forbes*, 124 S.W.3d at 172. Conversely, more than a scintilla of evidence exists when reasonable and fair-minded individuals could differ in their conclusions. *Forbes*, 124 S.W.3d at 172; *Ortega*, 97 S.W.3d at 772 (citing *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex. 1994)). In determining whether the non-movant has produced more than a scintilla of evidence, we review the evidence in the light most favorable to the non-movant, crediting such evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Tamez*, 206 S.W.3d at 582; *City of Keller v. Wilson*, 168 S.W.3d 802, 825, 827 (Tex. 2005).

We review the trial court's granting of a traditional motion for summary judgment de novo. *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003); *Branton v. Wood*, 100 S.W.3d 645, 646 (Tex. App.–Corpus Christi 2003, no pet.). When reviewing a traditional summary judgment, we must determine whether the movant met its burden to establish that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979). The movant bears the burden of proof and all doubts about the existence of a genuine issue of material fact are resolved against the movant. *See Sw. Elec. Power Co.*, 73 S.W.3d at 215. We take as true all

9

evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

When, as here, an order granting summary judgment does not state the specific grounds on which summary judgment was granted, we will uphold it on any meritorious ground presented in the motion. *Cincinnati Life Ins. Co. v. Cates*, 947 S.W.2d 608, 610 (Tex. 1997). Moreover, when a party moves for summary judgment under both rules 166a(c) and 166a(i) of the Texas Rules of Civil Procedure, we first review the trial court's judgment under the standards of rule 166a(i). *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). If the appellant fails to produce more than a scintilla of evidence under that burden, then there is no need to analyze whether appellee's summary judgment proof satisfies the rule 166a(c) burden. *Id.*

## B.    Premises Liability

By their first issue, the Petersons argue that they presented evidence creating a genuine issue of material fact as to their premises liability claim. It is undisputed that Peterson, as an employee of an independent contractor, was an invitee on the Gulf Wind project site. Therefore, to survive summary judgment on their premises liability claim, the Petersons were required to establish that: (1) RES was a possessor of the property; (2) RES knew[8] or should have known of a dangerous condition on the premises; (3) the condition presented an unreasonable risk of harm; and (4) the condition proximately caused Peterson's injuries. *See Brinson Ford, Inc. v. Alger*, 228 S.W.3d 161, 162 (Tex. 2007) (citing *Seideneck v. Cal Bayreuther Assocs.*, 451 S.W.2d

---

[8] There was no evidence presented that RES had *actual* knowledge of the defect at issue prior to Peterson's accident.

10

752, 754 (Tex. 1970)); *see also Shell Oil Co. v. Khan*, 138 S.W.3d 288, 291-92 (Tex. 2004) (noting that a general contractor owes the same duty as a premises owner to an independent contractor's employee); *Koch Ref. Co. v. Chapa*, 11 S.W.3d 153, 155 (Tex. 1999). When a general contractor knows or should have known of a dangerous condition on the premises, it is required to "take whatever action is reasonably prudent under the circumstances to reduce or to eliminate the unreasonable risk from that condition." *TXI Operations, L.P. v. Perry*, 278 S.W.3d 763, 764-765 (Tex. 2009) (citing *Corbin v. Safeway Stores, Inc.*, 648 S.W.2d 292, 295 (Tex. 1983)).

A general contractor is considered a "possessor" of the property at issue if it retains the right of supervisory control over work on the premises. *See Coastal Marine Serv. of Tex., Inc. v. Lawrence*, 988 S.W.2d 223, 225-26 (Tex. 1999) (citing *Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 527 (Tex. 1997)); *Thornhill v. Ronnie's I-45 Truck Stop, Inc.*, 944 S.W.2d 780, 788 (Tex. App.—Beaumont 1997, writ denied). "In determining whether an owner has retained this right to control, the standard is narrow. The right to control must be more than a general right to order work to stop and start, or to inspect progress." *Coastal Marine Serv.*, 988 S.W.2d at 226. The supervisory control must relate to the activity that actually caused the injury, and grant the general contractor at least the power to direct the order in which work is to be done or the power to forbid it being done in an unsafe manner. *See id.* (citing *Olivo*, 952 S.W.2d at 528; *Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 23 (Tex. 1993); *Redinger*, 689 S.W.2d at 418). "There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." *Koch Ref. Co.,* 11 S.W.3d at 155 (citing RESTATEMENT (SECOND) OF TORTS § 414 cmt. c (1965)).

11

A party can prove the right to control in two ways: first, by evidence of a contractual agreement which explicitly assigns the general contractor a right to control; and second, by evidence that the general contractor actually exercised control over the job. *See id.* (citing *Olivo*, 952 S.W.2d at 528). Generally, the former is a question of law for the court and the latter is a question of fact for the jury. *Shell Oil Co.*, 138 S.W.3d at 292. The Petersons argue both theories.

First, the Petersons argue that the contract executed by RES and Gulf Wind "clearly establish[es] that RES had a right to control the property." They also point to the "Site Passport" issued by RES which requires, among other things, that "[a]ll climbing and lifting equipment must be inspected every day before use and defective equipment replaced immediately." However, a contract requiring independent contractors to comply with general safety practices and train their employees to do so does not constitute a right to control job-site safety. *Id.* at 293-94 (citing *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 611 (Tex. 2002) (finding no right to control raised by allegation that subcontractor's employees were required to be "indoctrinated" with general contractor's safety rules); *Hoechst-Celanese Corp. v. Mendez*, 967 S.W.2d 354, 357-58 (Tex. 1998) (finding no right to control in contractual provision requiring contractor to train its employees in general contractor's safety-related rules and regulations)). Instead, requiring subcontractors' employees to learn and follow general safety procedures subjects an owner only to a "narrow duty to avoid increasing the risk of injury." *Id.* (citing *Koch Ref. Co.*, 11 S.W.3d at 156; *Hoechst-Celanese Corp.*, 967 S.W.2d at 357-58). Here, the Petersons did not allege or present evidence that the RES's promulgation of safety rules and regulations in the main contract or site passport increased any risk of injury to Peterson. *See id.* Moreover, as noted by RES, the main

12

contract specifically excluded the work Peterson was doing at the time he was injured—installation of instrumentation on met masts—from the description of RES's scope of work. We conclude that there is no evidence that RES retained a contractual right of control over DNV or Peterson with respect to the activity Peterson was engaged in at the time of his injuries.

The Petersons further argue that, regardless of the contracts, the conduct of RES "shows that they exercised actual control of the premises." They point specifically to: the "Site Passports"; RES's "Illness and Injury Prevention Program"; Elizondo's deposition testimony in which he stated that RES was "the boss," it was "their site," and he followed "their rules"; Fowler's testimony that RES "supervised" the construction of the roads leading to the met tower staging site and that all subcontractors were instructed "not to go in the wetlands"; the work permit issued to Ionos dated January 30, 2009; and the minutes from the safety meeting held on October 22, 2008. We find that none of these constitute evidence that RES "actually exercised control over the job." *See Coastal Marine Serv.*, 988 S.W.2d at 226. The site passports do not list any rules arguably applicable to the proper staging of met towers. The "Illness and Injury Prevention Program" applied only to RES employees, and so could not establish a right of control over independent contractor employees such as Peterson. While Elizondo did state that RES was "the boss," he agreed that "RES didn't at all get involved in the actual work that you were doing out there in terms of the erection of the [met] towers." The 2009 work permit was not evidence that RES retained a right to control DNV's or Peterson's work as of November 9, 2008, when the injury occurred. The safety meeting minutes noted that all subcontractors were required to "identify staging areas" but do not establish that RES actually retained the right to control where the staging areas were

13

located.  Finally, although RES may have "supervised" road construction, and that road construction may have led to the improperly-staged met tower, that is not enough under the applicable law to establish that RES was a "possessor" of the property such that it would be liable under a premises defect theory.  *See Koch Ref. Co.*, 11 S.W.3d at 155 (noting that the right of control must be such "that the contractor is not entirely free to do the work in his own way"); *Coastal Marine Serv.*, 988 S.W.2d at 226 (noting that the right of control "must relate to the activity that actually caused the injury").

We conclude that the trial court did not err in granting RES's no-evidence summary judgment motion with respect to the Petersons' premises liability claim.  *See* TEX. R. CIV. P. 166a(i).  Issue one is overruled.

## C.    Negligence and Negligent Undertaking

By their second issue, the Petersons contend that they produced more than a scintilla of evidence establishing RES's liability under traditional negligence and negligent undertaking theories.  Again, we disagree.

A general contractor generally owes no duty to ensure that its independent contractors perform their work in a safe manner.  *Gen. Elec. Co. v. Moritz*, 257 S.W.3d 211, 214 (Tex. 2008).  However, as with a premises liability claim, one who retains a right to control the contractor's work may be held liable for negligence in exercising that right.  *Id.*  Here, we have already determined that the Petersons have not met their burden to produce evidence raising a genuine issue of material fact as to whether RES retained a right to control DNV's or Peterson's work.  Accordingly, no-evidence summary judgment in favor of the RES entities on the Petersons' traditional negligence claim was proper.  *See* TEX. R. CIV. P. 166a(i).

14

We further conclude that the Petersons have not met their burden with respect to their claim of negligent undertaking. Under that theory,

> [o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a)     his failure to exercise such care increases the risk of such harm, or
>
> (b)     the harm is suffered because of the other's reliance upon the undertaking.

*Torrington Co. v. Stutzman*, 46 S.W.3d 829, 839 (Tex. 2000) (citing RESTATEMENT (SECOND) OF TORTS § 323 (1965)). The Petersons alleged specifically that RES undertook the job of building the road that led to the met tower staging area, that they did the job negligently, and that this led to Peterson's injuries. Without considering whether evidence was produced that RES was negligent in constructing the road or whether Peterson relied on RES's performance in that regard, we find that the faulty nature of the road was not a proximate cause of Peterson's death. The Petersons essentially assert that the condition of the road was so poor, and its dimensions so narrow, that it was insufficient to support the weight of the crane that was to be used for constructing the met towers, and the met towers therefore had to be staged in a soft, grassy area, which led to Peterson's fall. However, it was Ionos that actually decided to place the met tower sections on the unstable patch of land. Moreover, there is no evidence that Ionos was incapable of contacting RES to inform it that no safe staging area was available for the met tower sections, or to request that it reconstruct or reconfigure the road to make it suitable for those purposes.

15

Under these circumstances, we agree with RES that, at most, RES's conduct in building the road merely furnished the condition that made Peterson's injury possible, which is insufficient to establish legal cause. *See Roberts v. Healey*, 991 S.W.2d 873, 878 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) ("Cause in fact does not exist if the defendant's negligence does no more than furnish a condition which made the injury possible.") (citing *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 776 (Tex. 1995)); *see also Transcont'l Ins. Co. v. Crump*, 330 S.W.3d 211, 224 (Tex. 2010) ("[F]or an act or event to rise to the level of cause in the legal sense, the act or event must be such that reasonable jurors would identify it as being actually responsible for the ultimate harm. The cause must be more than one of the countless ubiquitous and insignificant causes that in some remote sense may have contributed to a given effect as, for example, simply getting up in the morning.").

We conclude that the trial court did not err in granting no-evidence summary judgment to all three RES entities on the Petersons' negligent undertaking claim.[9] *See* TEX. R. CIV. P. 166a(i). The Petersons' second issue is overruled.

### III. CONCLUSION

Having overruled the Petersons' two issues, we affirm the judgment of the trial court.

DORI CONTRERAS GARZA
Justice

Delivered and filed the
30th day of June, 2011.

---

[9] We need not address the Petersons' contention that "each of the various RES entities as the RES companies are vicariously liable for the conduct of the limited partner, in this case, [RES-C], through the theory of joint enterprise," because, even if RES-A and RES-AC were vicariously liable, we have already determined that no-evidence summary judgment in favor RES-C was proper with respect to all of the Petersons' claims.