# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00240-CV

**Curtis L. Delancey, Appellant**

**v.**

**Marian D. Delancey, Appellee**

### FROM THE DISTRICT COURT OF BASTROP COUNTY, 423RD JUDICIAL DISTRICT NO. 06-10892, HONORABLE CHRISTOPHER DARROW DUGGAN, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

The trial court granted appellee Marian D. Delancey's petition for divorce from appellant Curtis L. Delancey and divided the couple's property.[1] In five issues, Curtis appeals the trial court's final divorce decree, asserting that the court abused its discretion in (1) awarding Marian economic reimbursement for her management of Curtis's company, Flash Wrecker Service; (2) finding that the community estate was entitled to economic contribution against Curtis's separate-property estate; (3) awarding Marian an equitable lien against a parcel of Curtis's separate real property; (4) appointing a receiver to liquidate various assets; and (5) failing to completely divide the parties' community assets and debts. We will reverse the trial court's decree and remand the cause to that court for a new division of the community-property estate.

---

[1] For clarity, we will refer to the parties by their first names.

**FACTUAL AND PROCEDURAL BACKGROUND**

Curtis and Marian entered into an informal marriage on October 3, 1983. Prior to the marriage, Curtis bought a parcel of land at 5106 Johnson Boulevard in Austin, which was later renamed 5106 General Aviation Boulevard (the "General Aviation land") after nearby Bergstrom Air Force Base became Austin-Bergstrom International Airport. Although the written sales contract was lost, Curtis testified that he bought the land from a friend in 1978 for $25,000, paying about $5,000 in cash and assuming the previous owner's mortgage, the original principal amount of which was $19,500 in 1976. Curtis did not remember the exact amount of the mortgage that he assumed, but he testified that it was probably very close to the full $19,500, as little principal would have been repaid by the first holder of the mortgage in the two years before Curtis assumed it. Curtis testified that the payments on the note were $153 per month, which he himself paid until he married Marian, after which they paid the note together. Curtis also testified that he owned and operated two sole proprietorships before the marriage: (1) a towing company called Flash Wrecker Service ("Flash") that he started in 1975, and (2) a salvage business originally called Flash Used Auto Parts, which he started in 1980 and later renamed A&A Auto Salvage ("A&A") after Flash Used Auto Parts took over the name and location of a defunct salvage yard.

Flash was located on the General Aviation land from 1978 until Curtis sold the parcel to the City of Austin in early 2007. A&A was located on a separate but nearby location until Curtis relocated it to the General Aviation land in 1991. Like Flash, A&A remained on the land until it was sold in 2007. To facilitate A&A's move in 1991, the parties borrowed $110,000 from the U.S. Small Business Administration ("SBA"). They both testified that the money was used to pay off the

2

remaining $11,561.83 debt on the General Aviation land, to computerize A&A's inventory, and to build a six-bay warehouse for A&A's use. The parties testified that they repaid the SBA loan using community funds.

The parties agree that beginning in 1985 Marian managed Flash and Curtis managed A&A, although they dispute the impetus for that arrangement. Marian testified that she began managing Flash out of necessity because Curtis had been barred from the general area as a condition of his court-ordered probation stemming from a fight with an unrelated party. Although Curtis acknowledged that he was barred from the area for a year, he testified that Marian began working at Flash because she "wanted to go back to work" after the birth of their oldest child. Curtis testified that Marian at first was merely "answering the phone and helping with the paperwork, and just whatever needed to be done," but that she was good at her job and quickly assumed day-to-day responsibility for Flash. He testified that this was a mutually beneficial division of labor, allowing him to concentrate his time on A&A. Curtis testified that he never gave Marian an ownership interest of either company and that he continued to exercise ultimate, if not day-to-day, control at both companies.

Marian testified that Flash prospered under her leadership, expanding from a single steady towing account to "fifteen to twenty steady accounts." Marian testified that from 1985 on, she was the family's main breadwinner:

Q.      Who was the one who brought the real income in the family and made it?

A.      From '85 on, mainly me. I took care of the drivers and my kids—our kids—the salvage yard's money was the salvage yard's money. [Curtis] bought cars.

3

Q. He didn't have anything—he didn't add anything to the family budget?

A. Very little.

Although Curtis acknowledged that Marian handled most of the day-to-day family finances, including writing checks—Curtis preferred to deal only in cash—he testified that he was the family's primary provider. Neither party provided documentary evidence of either business's financial performance or market value at any time before, during, or at the end of the marriage, nor did they provide evidence showing either business's respective contribution to the family budget.

During the early 2000s, the marriage began to fray, which Marian asserted was largely caused by Curtis's emotional problems stemming from his tour of duty in Vietnam. She testified:

Q. And so you started having problems with Curtis when?

A. In 2003.

Q. What were the problems?

A. All of his problems was with the V.A., with the PTSD, with survivor skills, and it was just all with him.

Q. And he said today that he was probably the real problem of that. Would you agree with that, as far as the kind of split-up in 2003?

A. Yes.

In 2003, Curtis moved out of the family home and into an R.V. adjacent to the salvage yard on the General Aviation land. Curtis testified that this move was prompted by a need for more security at the site because of a series of burglaries. Curtis testified that the couple stayed on good terms for several years, remaining a family despite his sleeping elsewhere at night. Although admitting that

4

his post-traumatic stress syndrome symptoms were partially to blame for the couple's breakup, he ultimately attributes the breakdown in the relationship to Marian's relationship with another man.

Whatever the cause of the breakup, it is undisputed that after 2003 both the marriage and the couple's businesses deteriorated. Although the exact preceding circumstances are unclear, starting in 2006 and continuing until Flash moved to its new location in March of 2007, Curtis sporadically prevented Marian from coming to work at Flash. At trial, Marian testified:

A.  [Curtis] kept evicting me from the property, locking the gate and wouldn't let me back in. I'd have drivers lined up at the gate trying to bring cars in and he wouldn't let them in. And he would only let my son in and one of the drivers. And it was an ongoing process constantly—the fighting—it just got worse. It never stopped.

Q.  Okay. What happened to Flash Wrecker?

A.  I was still going to work at Flash Wrecker. He wouldn't let me in to work at Flash Wrecker. I was going to work—where I was living, I was just going to work out of the house and Bobby, our son, was going to bring me the paperwork. I answered the phone 24/7. The phone stayed transferred to my cell phone, and that all stopped, too, because he stepped in and took over and would not let me back out. I had to have the deputies go with me several times to get back in.

Q.  To get back in for what purpose?

A.  Just to go to work.

. . . .

Q.  Okay. Why were you locked out in '06 and '07?

A.  Why was he calling me all hours of the night telling me I was evicted? I don't know.

Q.  What reason were you given that you were locked out of the property?

5

A. Never did get a reason.

Q. Just silently locked the gates and walked away?

A. Depends on his mood.

Marian also testified that Flash's business suffered as a result of her inability to operate it normally, with profits declining from an unspecified high to virtually nothing in 2007.[2] In January 2008, Marian moved out of state and thus stopped working at Flash. She testified:

Q. So what happened to Flash Wrecker?

A. [Curtis] had Bobby [the couple's son] take over Flash Wrecker, and from then on my twenty-plus years there has gone straight down the hill in less than two years.

Q. Does Flash Wrecker have any real value anymore?

A. Not today.

Q. So did they lose all the accounts you had built up over the years?

A. I believe the only account that they [still] have is the Avis [account].

---

[2] The only evidence in the record as to Flash's fiscal performance comes from testimony Curtis gave under examination by Marian's counsel.

Q. So Flash Wrecker—now, Flash Wrecker was, when Ms. Delancey was running it, was making $15,000 a month?

A. Probably.

Q. After she quit in January of 2008, what did Flash do after that?

A. I have no idea.

Curtis confirmed that after Marian moved, he gave Flash to his son Bobby. He testified:

> A. I didn't want nothing to happen—after she left, it was over with, I gave it to him. He's been running it.
>
> Q. Let's talk about what happened to Flash Wrecker after she left, tell us.
>
> A. I gave it to my son.
>
> Q. Gave to son.
>
> A. When she left we had an option, close it down—and I would close it down right then, or—he begged me to let him keep running it. He said he could do it without her. And that's what I did.

Although Marian asserted that Curtis wasted the community's assets (i.e., lowering the value of Flash and thus the community's claim for reimbursement for Marian's increasing the value of that company) when he prevented Marian from working at Flash, the trial court did not make a finding as to waste.

In early 2006, Curtis, acting through a real estate agent, inquired whether the City of Austin was interested in purchasing the General Aviation land. Due to the parcel's proximity to Austin-Bergstrom Airport, the City had expressed interest in buying or taking the land for airport use several times over the preceding decade. So strong was the City's interest, the parties testified, that they declared bankruptcy in the mid-1990s as a way to prevent the City from taking the land. According to the parties, the City's previous offers had been too low to allow them to relocate their businesses and thus were rejected. In June of 2006, the City ordered an appraisal of the land. Shortly thereafter, Curtis created the "Curtis Delancey Family Trust" and transferred ownership of the land to the trust. The trust was revocable and listed Curtis as both the primary trustee and

beneficiary, with Marian and the couple's two adult children listed as secondary beneficiaries. The parties disagree on Curtis's motives for creating the trust. Marian asserted that it was merely an attempt to shelter profit from a pending sale of the General Aviation land from a claim for equitable contribution by the community estate. Curtis denies this, noting that Marian and the couple's two children were both secondary trustees and beneficiaries and thus stood to control the trust or inherit its corpus should he become incapacitated or die.

In January of 2007, the trust sold the General Aviation land to the City for $600,000. A condition of the sale required removing Flash and A&A's equipment and inventory, including numerous junked vehicles from the salvage yard. Curtis testified that he had a very short window—90 days from the date of the sale—to search for a suitable site, purchase that site, and begin to move the inventory to that location. He did so, paying $325,000 for two lots on Dee Gabriel Collins Road (the "Dee Gabriel land"). He also spent $195,000 on moving expenses, but earned about $30,000 from the sale of scrap metal from cars that he did not move. Marian asserted that Curtis substantially overpaid for the Dee Gabriel land, wasting a portion of the community's share of the General Aviation land's appreciation. The trial court did not make findings relevant to this assertion.

In addition to introducing evidence about the General Aviation land and the businesses, the parties also testified about their assets and debts, including several cars, a gun collection of undetermined size or value that Curtis claims he gifted to his son, several large containers full of unclassified auto parts of undetermined value, and a large R.V. parked on the Dee Gabriel land in which Curtis currently lives.

8

After hearing the evidence, the trial court made the following relevant findings of fact:

14. Before the marriage of the parties, Curtis L. Delancey owned the following property with the values shown: 5106 General Aviation Blvd. Austin, Texas.

15. Curtis L. Delancey paid a down payment of $5500 on October 1, 1978 for the real property located at 5106 General Aviation Blvd., Austin, Texas.

16. The community estate made payments on the property in the amount of $14,688 on that real property located at 5106 General Aviation Blvd., Austin, Texas.

17. The following are liabilities of the community estate: none.

18. The following are the liabilities of Marian D. Delancey: none.

19. The following are the liabilities of Curtis L. Delancey: none.

20. Marian Delancey spent many hours in time, toil, talent, and effort running the wrecker yard which was Flash Wrecker, the separate property of [Curtis], which is a business entity under his control and direction. [Curtis] made a windfall as a result of this time, toil, and effort which was value which exceeded what was reasonable necessary to manage and preserve [his separate property]. The property sold for in excess of $500,000. The value of that time spent in time, toil, and effort running the wrecker yard, by Petitioner, Marian Delancey, is $100,000 as a reimbursement for her share of the community claim and which is the amount of the reimbursement to her as a division of the community estate. . . .

23.[3] The Original Sales Price paid by [Curtis] for [the General Aviation land] was $25,000 in 1978 with $5,500 down and a note payable to Seller at the rate of $153 per month. . . . The note was reduced by the community in the amount of $153 per month or $1,836 per year for 8 years. The total paid on the note during this 8 years was $14,688. In 1991, $110,000 was borrowed by the community to pay the balance of the note and to make improvements on the property. The note was paid in full by the community estate for the benefit

---

[3] There were no findings of fact 21 or 22, nor was there a finding of fact 24.

9

of Respondent's separate estate. The total of the amount borrowed and the amount paid on the note over the 8 years equals a total of $124,688 economic contribution. The proceeds of the sale of this property were used to purchase the [Dee Gabriel land] which is the property that was eventually benefitted as a result of the economic contribution claim.

25. The court took into consideration the following factors in making a determination of a just and right division: The Court considered the factors of the amount of money spent by the community estate in paying for and enhancing the Respondent's separate property, the amount of time, toil, talent and effort put into the separate property of [Curtis] by [Marian], and the windfall which [Curtis] received from the City of Austin who purchased [the General Aviation land] for a large amount due to the business which [Marian] managed on the property.

The court determined the proper amount of economic contribution that the "community estate made . . . to [Curtis's] separate estate [was] $124,688." The court calculated that figure by adding the $110,000 SBA loan to $14,688—the amount of debt principal reduction on the General Aviation land paid by the community, as calculated by the court. The court then divided the $124,688 into two roughly equal parts and awarded Marian a judgment for $62,000. The court also awarded Marian the entire $100,000 of the community's reimbursement claim.

The court rendered judgment in favor of Marian for a total of $162,000 and placed three equitable liens against the Dee Gabriel land to secure payment. The court also appointed a receiver "to take possession of the real property and all other assets of [the] parties and to sell the assets to pay the judgment for [Marian]" and also enjoined Curtis from selling the Dee Gabriel land pending the disposition of this appeal.

10

## STANDARD OF REVIEW

In a decree of divorce, the trial court "shall order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage." Tex. Fam. Code Ann. § 7.001 (West 2006). A just and right division of the couple's community property need not be an equal split. *Murff v. Murff*, 615 S.W.2d 696, 698 (Tex. 1981). Rather, the court may consider numerous factors in deciding how to divide the couple's community property, including such things as relative ages, education levels, job prospects, and sizes of separate property estates. *Id.* "The trial court has wide discretion in dividing the estate of the parties and that division should be corrected on appeal only when an abuse of discretion has been shown." *Id.* A trial court abuses its discretion if it "act[s] without reference to any guiding rules and principles, such that its ruling [is] arbitrary or unreasonable." *American Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006) (per curiam). A court has no discretion, however, in determining what the law is or in applying the law to the facts. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992). "Thus, a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion." *Id.*

When deciding if the trial court abused its discretion, "the factual and legal sufficiency of the evidence are not independent grounds for appeal but are relevant considerations." *Goodson v. Castellanos*, 214 S.W.3d 741, 756 (Tex. App.—Austin 2007, pet. denied). "[W]e review the trial court's findings of fact under the same standards for legal and factual sufficiency that govern review of jury findings." *Hailey v. Hailey*, 176 S.W.3d 374, 383 (Tex. App.—Houston [1st Dist.] 2004, no pet.). In a legal-sufficiency review, we review the evidence in the light most

11

favorable to the fact finding, crediting favorable evidence if a reasonable fact finder could, and disregarding contrary evidence unless a reasonable fact finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). A finding is not supported by legally sufficient evidence if the record reveals: (1) the complete absence of evidence of a vital fact; (2) that the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) that the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) that the evidence conclusively establishes the opposite of a vital fact. *Id.* More than a scintilla of evidence exists when reasonable and fair-minded people could differ in their conclusions based on the evidence in the record. *Forbes, Inc. v. Granada Biosciences*, 124 S.W.3d 167, 172 (Tex. 2003).

"When reviewing a [fact finding] to determine the factual sufficiency of the evidence, the court of appeals must consider and weigh all the evidence, and should set aside the [finding] only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). "The court of appeals is not a fact finder. Accordingly, the court of appeals may not pass upon the witnesses' credibility or substitute its judgment for that of the [fact finder], even if the evidence would clearly support a different result." *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998).

If we find reversible error in any part of the trial court's property division that materially affects its just and right division of the community estate, we must remand for a new division of the entire community estate. *Jacobs v. Jacobs*, 687 S.W.2d 731, 732-33 (Tex. 1985).

12

## DISCUSSION

### *Economic Reimbursement*

In his first issue, Curtis asserts that the trial court abused its discretion in finding that the community estate was entitled to economic reimbursement from Curtis's separate estate based on Marian's operation of Flash. Under former family code section 3.408, a party may bring a claim for reimbursement by the community estate against a spouse's separate property estate for "inadequate compensation for the time, toil, talent, and effort of a spouse by a business entity under the control and direction of that spouse." Act of May 18, 2001, 77th Leg., R.S., ch. 838, § 2, 2001 Tex. Gen. Laws 1679, 1682, *repealed by* Act of May 29, 2009, 81st Leg., R.S., ch. 768, § 11(5), 2009 Tex. Gen. Laws 1950, 1951-52; *see also Dakan v. Dakan*, 83 S.W.2d 620, 627 (Tex. 1935) (first recognizing common-law right to reimbursement). The court "shall resolve a claim for reimbursement by using equitable principles, including the principle that claims for reimbursement may be offset against each other." Act of May 18, 2001, 77th Leg., R.S., ch. 838, § 2, 2001 Tex. Gen. Laws 1679, 1682; *see also Dakan*, 83 S.W.2d at 627 ("[Calculation of reimbursement] is not a mere question of balancing ledger accounts.").

Curtis argues that the trial court's finding that Marian's time, toil, talent, and effort in running Flash increased the value of the General Aviation land is not supported by legally or factually sufficient evidence. He argues that the "court 'mixed apples and oranges' when it found that [Curtis] made a windfall as a result of [Marian's] time, toil, and effort" because the court erroneously credited the appreciation of the General Aviation *land* to Marian's efforts in running Flash, a mere tenant on the land. Thus, he argues, the court's award based on that finding was an

13

abuse of discretion. Curtis also asserts that, even if the court had not "mixed apples and oranges," there is no evidence as to Flash's value before or during Marian's leadership and thus no basis on which to calculate a reimbursement award.

Marian argues that the court's finding was supported by legally sufficient evidence. She cites her testimony regarding capital improvements the couple made on the land with the proceeds from the SBA loan and her testimony that she "brought the real income into the family" while the business that Curtis ran never made much money. She notes that she "wrote and signed the checks" for the mortgage on the General Aviation land and that, despite this, she did not receive any of the proceeds from the sale.

Although the parties both testified that Marian was a talented and diligent manager, there is no evidence in the record from which a reasonable fact finder could have concluded that her time, toil, talent, and effort in running Flash caused the General Aviation land to increase in value. Marian's testimony with respect to the capital improvements and loan principal reduction are relevant to her economic-contribution claim (discussed below), but her testimony does not give rise to a reasonable inference that the value of the General Aviation land increased as a result of her inadequately compensated time, toil, talent, or effort in running the business. Such an inference is particularly unreasonable in light of the parties' testimony that the land's value increased due to its proximity to the City's new airport and also that, as a condition of any sale to the City, Flash and A&A's equipment and inventory had to be completely removed from the land. Likewise, Marian's testimony that Flash's profits provided the family's primary source of support is not evidence that her uncompensated efforts managing Flash increased the value of the General Aviation land.

14

Accordingly, we hold that the evidence was legally insufficient to support the trial court's finding that Marian's inadequately compensated time, toil, talent, and effort in running Flash increased the value of the General Aviation land. Because the reimbursement award was based on this erroneous finding, we hold that the trial court abused its discretion in determining that the community-property estate was entitled to economic reimbursement from Curtis's separate-property estate. We sustain Curtis's first issue.

### *Economic Contribution*

In his second issue, Curtis asserts that the trial court abused its discretion in finding that the community estate was entitled to economic contribution from his separate-property estate. First, he asserts that the evidence was legally and factually insufficient to support a claim for economic contribution. Specifically, he argues that the trial court lacked sufficient evidence to determine the numbers to "plug into" the applicable statutory formula. Second, he asserts that the trial court erroneously ignored that formula, calculating the claim without regard to the controlling statute. We will address these contentions in reverse order.

*The Trial Court's Calculation of the Community's Contribution Claim*

Although the sections of the family code relevant to economic contribution that were in effect at the time of the divorce have since been repealed, they are controlling for purposes of this appeal. Former section 3.402 defined economic contribution as follows:

(a)  For purposes of this subchapter, "economic contribution" is the dollar amount of:

(1)  the reduction of the principal amount of a debt secured by a lien on property owned before marriage, to the extent the debt existed at the time of the marriage;

(2)  the reduction of the principal amount of a debt secured by a lien on property received by a spouse by gift, devise, or descent during a marriage, to the extent the debt existed at the time the property was received.

(3)  the reduction of the principal amount of that part of a debt, including a home equity loan:

(A)  incurred during a marriage;
(B)  secured by a lien on property; and
(C)  incurred for the acquisition of, or for capital improvements to, property;

(4)  the reduction of the principal amount of that part of a debt:

(A)  incurred during a marriage;
(B)  secured by a lien on property owned by a spouse;
(C)  for which the creditor agreed to look for repayment solely to the separate marital estate of the spouse on whose property the lien attached; and
(D)  incurred for the acquisition of, or for capital improvements to, property;

(5)  the refinancing of the principal amount described by Subdivisions (1)-(4), to the extent the refinancing reduces that principal amount in a manner described by the appropriate subdivision; and

(6)  capital improvements to property other than by incurring debt.

(b)     "Economic contribution" does not include the dollar amount of:

     (1)     expenditures for ordinary maintenance and repair or for taxes, interest, or insurance; or

     (2)     the contribution by a spouse of time, toil, talent, or effort during the marriage.

Act of May 22, 2001, 77th Leg., R.S., ch. 692, § 2, 2001 Tex. Gen. Laws 1679, 1680-81, *amended by* Act of May 29, 2009, 81st Leg., R.S., ch. 768, § 3, 2009 Tex. Gen. Laws 1950, 1951-52. Former section 3.403 authorized a claim for economic contribution and set forth the formula by which the claim must be calculated. It stated, in relevant part:

(a)     A marital estate that makes an economic contribution to property owned by another marital estate has a claim for economic contribution with respect to the benefitted estate.

(b)     The amount of the claim is equal to the product of:

     (1)     the equity in the benefitted property on the date of dissolution of the marriage, the death of a spouse, or disposition of the property multiplied by

     (2)     a fraction of which:

          (A)     the numerator is the economic contribution to the property owned by the benefitted marital estate by the contributing marital estate; and

          (B)     the denominator is an amount equal to the sum of:

               (i)     the economic contribution to the property owned by the benefitted marital estate by the contributing marital estate; and

               (ii)     the contribution by the benefitted estate to the equity in the property owned by the benefitted estate.

17

(b-1)    The amount of the contribution by the benefitted marital estate under Subsection (b)(2)(B)(ii) is measured by determining:

. . . .

(2)    if the benefitted estate is the separate property estate of a spouse:

(A)    the net equity of the separate property estate in the property owned by the separate property estate as of the date of the first economic contribution to that property by the contributing community property estate or the separate property estate of the other spouse; and

(B)    any additional contribution to the equity in the property owned by the separate property estate made by the benefitted separate property estate after the date described in Subdivision (A).

Act of May 28, 2003, 78th Leg., R.S., ch. 230 § 1, 2003 Tex. Gen. Laws 1056, 1056-57, *amended by* Act of May 29, 2009, 81st Leg., R.S., ch. 768, § 11(3), 2009 Tex. Gen. Laws 1950, 1953.

Curtis asserts that the trial court erred in failing to properly apply the statutory formula to calculate the value of the community's claim for economic contribution. By its own admission, the trial court did not apply the statutory formula. Instead, the court added the value of the SBA loan ($110,000)—which was used to pay down debt and make capital improvements to the General Aviation land and A&A—to the amount of debt principal on the General Aviation land's mortgage that it calculated was otherwise paid by the community during the marriage ($14,688). The court thus concluded that $124,688 was the community's claim for economic contribution to Curtis's separate property. It then divided that amount in two approximately equal parts, awarding Marian $62,000 without explicitly allocating the remainder of the community's claim to Curtis.

18

As noted above, a court has no discretion in determining what the law is or in applying the law to the facts. *See Walker*, 827 S.W.2d at 840. Thus, in the present case, the trial court erred in disregarding the family code's formula for computing the community's economic-contribution claim. Accordingly, we sustain Curtis's third issue in part. Because this error substantially altered the size of the divisible community estate, we conclude that it materially affected the trial court's just and right division of that estate. Consequently, if there is sufficient evidence to allow the formula to be applied, we must remand the cause for a new division of the community estate. *See Jacobs*, 687 S.W.2d at 732-33. If, on the other hand, there is no evidence of one or more of the elements of the statutory formula, we must render judgment disallowing the economic-contribution claim.

*Sufficiency of the Evidence*

Marian, on behalf of the community, made a claim against Curtis's separate-property estate for economic contribution stemming from two sources. First, she asserted that the community paid off a portion of the mortgage secured by the General Aviation land. Second, she asserted that the proceeds of the SBA loan, which the community repaid, were used to make capital improvements to Curtis's separate property—specifically, to build a warehouse on the land and to computerize A&A's inventory. Both parts of the claim are cognizable under former subsections 3.402(a)(2) and (a)(3) of the family code, respectively. *See* Act of May 22, 2001, 77th Leg., R.S., ch. 692, § 2, 2001 Tex. Gen. Laws 1679, 1680-81. Curtis asserts that both parts of Marian's claim fail because she "did not establish the evidence necessary to 'plug into' the formula." Specifically, he argues that Marian "failed to establish the net equity of [Curtis's] separate estate in the property at the time of

19

the first contribution by the community [and] the equity owned by the separate estate at the date of the divorce." Curtis asserts that this lack of evidence "hamstrung the court's ability to compute contribution, even if contribution was a proper remedy." We will examine the evidence as to each basis of the community's claim in turn.

<u>(i) General Aviation Land's Mortgage</u>

With respect to the community's principal repayment of the General Aviation land's mortgage, the statute required evidence of: (1) the equity in the General Aviation land on the date of sale; (2) the amount of principal debt reduction by the community; and (3) Curtis's equity in the land on the date of the first economic contribution. *See* Act of May 28, 2003, 78th Leg., R.S., ch. 230 § 1, 2003 Tex. Gen. Laws 1056, 1056-57.

The parties agree that the City bought the General Aviation land for $600,000 and there was no outstanding debt. Although neither party testified with exact figures as to the amount by which the principal debt was reduced by Curtis's payments before the marriage, that number can be derived mathematically from the evidence. Curtis testified that he paid $153 per month on a $19,500 mortgage from some time during 1978 (he is not certain of the date on which he purchased the land) to October of 1983, when the parties married. Given that the loan had a $19,500 principal amount, a $153 monthly payment, and a 30-year term, one can calculate an interest rate of 8.7%.[4]

---

[4] The formula for deriving the interest rate is mathematically complex, but the task is greatly simplified by the widespread availability of spreadsheet software and online amortization calculators. For example, in Microsoft Excel—using the PMT function—a $153 monthly payment on a $19,500 note with a 30-year term is produced by an interest rate of 8.7%. (The actual function, written out, is: =PMT(8.7%/12, 30*12, 19500).)

This, in turn, allows a determination of the amount of outstanding debt in October 1983, the month when the community made its first payment. Curtis testified that he made his first payment in 1978. Although we do not know in precisely which month the first payment was made, Marian agrees that the court should give Curtis the benefit of the doubt and assume it was January. Thus, from January 1978 to October 1983, Curtis made 69 payments of $153. Referring to an amortization schedule based on the interest rate, principal amount, and loan term, these payments would have reduced the principal amount of the debt by approximately $1,010. Since the parties agree that all the remaining debt principal was repaid out of community funds (a portion through monthly payments and the balance from proceeds of the SBA loan, which itself was repaid by the community), the evidence shows that the community reduced the debt principal by $18,490 ($19,500 - $1,010). As to the third number—the value of the land on October 1983—the record contains uncontradicted expert-witness testimony from W.F. Smith, a certified real estate appraiser, that the General Aviation land was worth approximately $34,000 in October 1983. Because Curtis did not contribute any additional separate property toward reducing the debt principal, the third number remains $34,000.[5]

_____

[5] Applying those numbers to the statutory formula yields the following calculation:

$$\$600,000 \times (\$18,490/(\$18,490+(\$34,000-\$18,490))) = \$326,294.$$

This number represents the community's share in the appreciation of the General Aviation land in proportion to its contribution to the equity in the land (in the form of debt repayment). The entire amount, of course, need not be apportioned solely to one party. It merely represents the *community's claim* on Curtis's separate-property estate and is thus subject to just and right division between the parties under former section 7.007 of the family code. *See* Act of May 18, 2001, 77th Leg., R.S., ch. 838, § 2, 2001 Tex. Gen. Laws 1679, 1682, *amended by* Act of May 29, 2009, 81st Leg., R.S., ch. 768, § 11(3), 2009 Tex. Gen. Laws 1950, 1952 ("[T]he court shall determine the

Accordingly, we hold that there is legally sufficient evidence in the record to support a claim for economic contribution based on the community's payment of the principal balance of the General Aviation land mortgage. Likewise, the evidence supporting such an award is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

### (ii) Capital Improvements to General Aviation Land and A&A

The portion of the community's economic-contribution claim based on capital improvements to the General Aviation land and A&A requires evidence of similar dollar amounts: (1) the equity in the General Aviation land at the time of its sale and the equity in A&A at the time of divorce; (2) the amounts of capital contribution to both the General Aviation land and A&A; (3) Curtis's equity in both the General Aviation land and A&A at the time of the first capital contribution. *See id.*

As noted above, the parties agree on the amount of equity in the General Aviation land—$600,000. Curtis argues, however, that there is no evidence in the record of A&A's value or its debts at the time of divorce. We agree. Neither party provided testimony or documentary evidence as to A&A's value during any time period. As to the amounts of the capital improvements, the parties agreed that they spent approximately $95,000 in total; however, there is no evidence as to what portion of that amount is allocable to capital improvements on the General Aviation land

---

rights of both spouses in a claim for economic contribution . . . and in a manner that the court considers just and right having due regard for the rights of each party and any children of the marriage shall . . . order a division of a claim for economic contribution of the community marital estate to the separate marital estate of one of the spouses.").

versus the amount spent to computerize A&A's inventory. As to Curtis's equity in the land and A&A at the time of the first community capital improvement, there is no evidence as to the relevant date for either the land or the business, nor is there evidence of the value of either the land or the business on that unknown date. In light of the absence of evidence as to those vital facts, we conclude that the evidence is not legally sufficient to support a claim for economic contribution based on the community's capital improvements to the General Aviation land and A&A.

*Summary*

We hold that (1) the trial court erred in failing to use the statutory formula for calculating the community's claim for economic contribution; (2) that error materially affected the just and right division of the community estate; (3) the evidence was legally and factually sufficient to support the community's economic-contribution claim for payment of debt principal on the General Aviation land; and (4) the evidence was not legally sufficient to support the community's contribution claim for capital improvements to the General Aviation land and A&A. Accordingly, we must remand the cause to the trial court for a new division of the community estate, which should include the community's properly calculated claim for contribution. *See Jacobs*, 687 S.W.2d at 732-33.

### Equitable Liens on the Dee Gabriel Land

In his third issue, Curtis asserts that the trial court erred in imposing three liens on the Dee Gabriel land: (1) a $162,000 "lien to equalize division"; (2) a $100,000 lien based on Marian's portion of the community's claim for reimbursement; and (3) a $62,000 lien based on

23

Marian's portion of the community's claim for economic contribution. Because we have determined that the trial court erred in granting judgment for Marian in those amounts, we sustain Curtis's third issue and reverse the portion of the judgment imposing those liens.

### *The Receiver*

In his fourth issue, Curtis asserts that the trial court erred in appointing a receiver to take possession of much of his separate property, including the Dee Gabriel land owned by the Curtis Delancey Family Trust, and sell it to satisfy the judgment. Because we reverse the underlying judgment on which the receiver's appointment was based, we likewise reverse the order appointing the receiver without addressing the merits of Curtis's argument with respect to the receiver's appointment.

### *Division of the Parties' Community Assets and Debts*

In his final issue, Curtis asserts the trial court erred in failing to make a complete division of the community's assets and debts. He notes that the parties presented evidence as to many assets and debts, but that the decree did not divide those assets and debts between them. Because we must remand the entire community-property estate for a new division, Curtis will have an opportunity to present this complaint to the trial court. Thus, we need not address this issue.[6]

---

[6] Although not directly applicable in the present case, we note that subsection 9.203(a) of the family code allows a party to petition the trial court to correct the type of omission alleged here. *See* Tex. Fam. Code Ann. § 9.203 (West 2006) ("If a court of this state failed to dispose of property subject to division in a final decree of divorce or annulment even though the court had jurisdiction over the spouses or over the property, the court shall divide the property in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage.").

24

## CONCLUSION

Having determined that the trial court erred in its calculation and division of the couple's community-property estate, we reverse the portion of the trial court's decree dividing the community estate. We remand the cause to the trial court for a new just and right division of the community estate consistent with this opinion. *See Jacobs*, 687 S.W.2d at 732-33. On remand, the court will have a new opportunity to decide related judgment-enforcement issues such as imposing equitable liens on the Dee Gabriel land and appointing a receiver.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Reversed and Remanded

Filed: February 24, 2011

25