NUMBER 13-10-00238-CV

 

COURT OF APPEALS

 

THIRTEENTH DISTRICT
OF TEXAS

 

CORPUS CHRISTI – EDINBURG

                                                                                                                             

 

D.
CHRISTOPHER PETERSON, INDIVIDUALLY AND                               

AS
ADMINISTRATOR OF THE ESTATE OF 

MATTHEW
C. PETERSON, DECEASED AND 

JUDITH PETERSON,                            
                                      Appellants,

                                                                             

 

v.

 

RES AMERICA CONSTRUCTION, INC.,                                    

Renewable Energy
Systems 

Americas, Inc.
(“RES-A”) 

and RES
(Construction), L.P. (“RES-C”).,                        Appellees.         

                                                                                                                             

 

On appeal from the 148th District Court

of Nueces County, Texas.

                                                                                                                             

 

MEMORANDUM OPINION

 

Before Justices Garza,
Vela and Perkes 

Memorandum Opinion by
Justice Garza 

 

            Appellants, Christopher D.
Peterson, individually and as administrator of the estate of Matthew C.
Peterson, deceased, and Judith Peterson, challenge the trial court’s summary
judgment dismissing their wrongful death suit against appellees, RES America
Construction, Inc. (“RES-AC”), Renewable Energy Systems Americas, Inc. (“RES-A”)
and RES (Construction), L.P. (“RES-C”).[1] 
By two issues, appellants contend that they raised fact questions as to their
premises liability and negligence claims.  We affirm.

I. 
Background

            Matthew Peterson, an
employee of DNV Global Energy Concepts, Inc. (“DNV”), was working in 2008 at a
wind farm being constructed on a portion of the Kenedy Ranch in Sarita, Texas. 
RES served as the general contractor overseeing construction at the wind farm,
and DNV had contracted with RES to build meteorological towers (“met towers”)
at the site.  On or about November 9, 2008, Peterson and a co-worker entered
the ranch in order to install a guyed boom on sections of one of the towers. 
Peterson climbed the tower to a height of approximately eight feet in order to
install an anemometer[2]
on the guyed boom.  However, the tower was not properly located, nor was it
properly anchored to the ground or stabilized.  As a result, the tower fell and
pinned Peterson to the ground, causing him to suffer severe injuries, and
ultimately causing his death.

            Appellants, Peterson’s
parents, filed a wrongful death suit against RES and several other defendants.[3] 
The Petersons claimed that RES was a “possessor” of the wind farm site at the
time of their son’s accident, and therefore, RES “exercised control” over the
premises and was liable under a premises liability theory.  They further
asserted a traditional negligence claim, as well as a claim of negligent
undertaking.  Under the latter theory, the Petersons alleged that RES
“voluntarily or gratuitously . . . undertook (1) the job of building the road
that led to the subject met tower staging area and (2) site safety.”  The
Petersons claimed that RES knew or should have known that these services were
“necessary” for their son’s protection, that Matthew relied upon RES’s
performance of these services, and that RES failed to exercise reasonable care
in performing those services.  More specifically, the Petersons alleged that “[t]he
road was built with defects, which defects directly led to the unsafe placement
of the subject tower section in the soft, sandy wetlands area.”

RES subsequently answered the suit and
filed two “hybrid” motions for traditional and no-evidence summary judgment.[4] 
In the first motion, RES-AC and RES-A contended that:  (1) RES was not the
possessor of the premises; (2) RES “played no role in causing and/or
contributing” to the creation of a condition on the premises posing an
unreasonable risk of harm to Peterson; (3) RES had no actual or constructive
knowledge of any such condition; and (4) RES owed no legal duty to Peterson and
breached no such duty.  In support of their motion, RES-AC and RES-A pointed to
a contract dated February 15, 2008, between RES-C and Gulf Wind LLC (“Gulf
Wind”).  According to the summary judgment motion, because the contract
demonstrated no legal relationship between RES-AC or RES-A with Gulf Wind, the
owner of the site at issue, those two RES entities were entitled to summary judgment. 
In the second hybrid summary judgment motion, RES-C claimed that there was no
evidence for the Petersons’ claims and argued further that the construction of
met towers was explicitly excluded from the contract’s definitions of the
“Project” at issue and RES’s “Scope of Work” with respect to the project.[5] 
Therefore, according to RES, it owed no duty to Peterson and was entitled to traditional
summary judgment.[6]

            The Petersons filed a response to
the first summary judgment motion arguing that RES was a “possessor” of the
site, that RES controlled the details of the work of subcontractors, that it
failed to warn of a dangerous condition, and that it undertook to perform work
at the site.  The Petersons attached several deposition transcripts to their response[7]
in support of their contention that fact issues existed on their causes of
action against RES.  One of those depositions was by Robert Elizondo, a
forklift operator employed by Ionos Communications (“Ionos”), which was DNV’s
subcontractor in charge of, among other things, determining where to place the
met towers.  Elizondo stated he participated in the staging of the tower
section which eventually collapsed and caused Peterson’s death.  Elizondo
agreed that, when the tower section was lowered into place, he noticed that it
“s[a]nk, to some extent, in the soft sand” underneath.  Elizondo stated that
the path leading to the erection site was initially “sand, soft sand, and we
couldn’t drive equipment or trucks out to the site because the sand was so soft.” 
Elizondo contacted a colleague at Ionos, “and he contacted RES, and they sent
operators and equipment out there and installed a small caliche road.” 
However, “[t]he road was small, narrow, and we deemed [it] insufficient for
supporting the weight of the crane that was to be coming in.”  According to
Elizondo, the condition of the road was the reason that the tower section was
eventually placed in soft sand:

Q. [Petersons’ counsel]      Okay.  So
as you’re going down the road with this tower section and you’re going to stage
it, how do you decide that you want to put it in that particular location?

 

A. [Elizondo]                         It
was just—at that point, we already knew the viability of the road was bad.  We
were going to have problems.  So we just set it on the left-hand side, out of
the way.

 

            John
Bruce, an RES representative, testified that a request was made to him to “form
an access road to the met mast.”  After the request was made, Bruce instructed
another RES employee, Tony LePape, to hire Ballenger Construction Co.
(“Ballenger”) to construct the road.  Andrew Fowler, RES’s senior vice
president for construction, acknowledged that RES supervised the road
construction and that this construction was critical to other work being done
on the site:

Q. [Petersons’ counsel]      Did RES
supervise the construction of the roads?

 

A. [Fowler]                             Yes.

 

                                                .
. . .

 

Q.                                            Would
it be correct to say that a lot of the work done out there is dependent upon
the roadwork that takes place?

 

A.                                            Yes.

 

Q.                                            You
got—roads are part of the infrastructure and you got to get your infrastructure
in place before you can start putting up your turbines?

 

A.                                            Yes.

 

Fowler also stated
that “wetland areas were demarcated throughout the site and we instructed our
subcontractors not to go in the wetlands.”

            Peterson
further argued in his response that RES exercised “substantial control over the
premises and the work details of the many companies at the site.”  In support
of this contention, Peterson pointed to a “Site Passport” issued by RES which
provided dozens of rules and regulations required to be obeyed by workers on
the site.  Those rules included the following:

3)         All climbing and lifting
equipment must be inspected every day before use and defective equipment
replaced immediately.

 

            . . . .

 

7)         All traffic must stay on
designated roads and rights-of-way.  Do not turn around or back into grass
areas unless clearly marked by clearing stakes.  DO NOT drive outside clearing
limits, and stay away from sensitive areas such as wetlands and sand dunes.

 

            . . . .

 

21)      All personnel must attend
site safety “tailgate talks” with their employers at least once a week; these
meetings must be documented on a record sheet.

 

            . . . .

 

28)      RES operates a “Three
Strikes” rule for safety violations:  Verbal, Written, and Dismissal.  Major
violations, such as violence (or threat thereof) towards others, drug or
alcohol abuse and/or willful negligence will result in violators being
immediately removed from site without warning.  RES management will determine
what constitutes a major violation.

 

            . . . .

 

33)      All work crews must carry the
emergency contact information and a cell phone or 2-way radio for safety. 
Nobody shall ever be unable to reach others for help.

 

            . . . .

 

36)      All near misses and accidents
must be reported to the RES office immediately and preventative measures taken
to stop the incident from reoccurring.  This includes damage to ranch property,
or accidents with livestock or wild game.

 

The Petersons note
that minutes from a “Site Safety and Environment Meeting” held at the Gulf Wind
project site on October 22, 2008, indicated that all workers on site were
instructed to “[s]tay off all wetlands unless authorized by RES” and that all
subcontractors needed to “identify staging areas at each work site.” 
Additionally, RES operated an “Illness and Injury Prevention Program” which was
explained in a document attached as an exhibit to the main contract with Gulf
Wind.  According to that document, RES site safety inspectors are required to
“[b]ring to the attention of subcontractors any activities that present a
hazard to their own personnel, other personnel, operatives or the general
public.”  The Petersons contend that, in the instant case, RES’s site safety
inspector did not comply with this policy.

            Finally,
the Petersons attached to their response a work permit issued by RES to Ionos,
entitled “Permit to Excavate,” dated January 30, 2009, and signed by Gary
Kriegel, an RES representative.  The permit stated:  “I have checked that all
precautions have been taken to ensure the safety of the excavation work
detailed above.  I consider it safe to carry out the work between the times and
dates specified.”

            The trial
court granted RES’s summary judgment motions without stating the grounds upon
which they were granted.  Peterson’s causes of action against RES were severed
from his causes of action against the other defendants, and he filed this
appeal.

II. 
Discussion

A.        Standard of
Review

            A motion
for summary judgment may be brought on no-evidence or traditional grounds.  See
Tex. R. Civ. P. 166a(c), (i).  A motion
for no-evidence summary judgment is equivalent to a motion for pretrial
directed verdict, and we apply the same legal sufficiency standard on review.  Mack
Trucks, Inc. v. Tamez, 206 S.W.3d 572, 582 (Tex. 2006); Ortega v. City
Nat’l Bank, 97 S.W.3d 765, 772 (Tex. App.—Corpus Christi 2003, no pet.)
(op. on reh’g); Moore v. K Mart Corp., 981 S.W.2d 266, 269 (Tex. App.—San
Antonio 1998, writ denied).  Such a motion should be granted if there is no
evidence of at least one essential element of the plaintiff’s claim.  Hamilton
v. Wilson, 249 S.W.3d 425, 426 (Tex. 2008) (per curiam).  The burden of
producing evidence is entirely on the non-movant; the movant has no burden to
attach any evidence to the motion, and if the non-movant produces evidence raising
a genuine issue of material fact, summary judgment is improper.  Tex. R. Civ. P. 166a(i).  All that is
required of the non-movant is to produce a scintilla of probative evidence to
raise a genuine issue of material fact on the challenged element.  Forbes,
Inc. v. Granada Biosciences, Inc., 124 S.W.3d 167, 172 (Tex. 2003); Ortega,
97 S.W.3d at 772.  “Less than a scintilla of evidence exists when the evidence
is ‘so weak as to do no more than create a mere surmise or suspicion of a fact.’”
Ortega, 97 S.W.3d at 772 (quoting Kindred v. Con/Chem, Inc., 650
S.W.2d 61, 63 (Tex. 1983)); see Forbes, 124 S.W.3d at 172.  Conversely,
more than a scintilla of evidence exists when reasonable and fair-minded
individuals could differ in their conclusions.  Forbes, 124 S.W.3d at
172; Ortega, 97 S.W.3d at 772 (citing Transp. Ins. Co. v. Moriel,
879 S.W.2d 10, 25 (Tex. 1994)).  In determining whether the non-movant has
produced more than a scintilla of evidence, we review the evidence in the light
most favorable to the non-movant, crediting such evidence if reasonable jurors
could and disregarding contrary evidence unless reasonable jurors could not.  Tamez,
206 S.W.3d at 582; City of Keller v. Wilson, 168 S.W.3d 802, 825, 827
(Tex. 2005).

We review the trial
court’s granting of a traditional motion for summary judgment de novo.  See
Provident Life & Accident Ins. Co. v. Knott, 128 S.W.3d 211, 215 (Tex.
2003); Branton v. Wood, 100 S.W.3d 645, 646 (Tex. App.–Corpus Christi
2003, no pet.).  When reviewing a traditional summary judgment, we must
determine whether the movant met its burden to establish that no genuine issue
of material fact exists and that the movant is entitled to judgment as a matter
of law.  Tex. R. Civ. P. 166a(c);
Sw. Elec. Power Co. v. Grant, 73 S.W.3d 211, 215 (Tex. 2002); City of
Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678 (Tex. 1979).  The
movant bears the burden of proof and all doubts about the existence of a
genuine issue of material fact are resolved against the movant.  See Sw.
Elec. Power Co., 73 S.W.3d at 215.  We take as true all evidence favorable
to the non-movant, and we indulge every reasonable inference and resolve any
doubts in the non-movant’s favor.  Valence Operating Co. v. Dorsett, 164
S.W.3d 656, 661 (Tex. 2005).

When, as here, an
order granting summary judgment does not state the specific grounds on which
summary judgment was granted, we will uphold it on any meritorious ground
presented in the motion.  Cincinnati Life Ins. Co. v. Cates, 947 S.W.2d
608, 610 (Tex. 1997).  Moreover, when a party moves for summary judgment under
both rules 166a(c) and 166a(i) of the Texas Rules of Civil Procedure, we first
review the trial court’s judgment under the standards of rule 166a(i).  Ford
Motor Co. v. Ridgway, 135 S.W.3d 598, 600 (Tex. 2004).  If the appellant
fails to produce more than a scintilla of evidence under that burden, then
there is no need to analyze whether appellee’s summary judgment proof satisfies
the rule 166a(c) burden.  Id.

B.        Premises Liability

            By their
first issue, the Petersons argue that they presented evidence creating a
genuine issue of material fact as to their premises liability claim.  It is
undisputed that Peterson, as an employee of an independent contractor, was an
invitee on the Gulf Wind project site.  Therefore, to survive summary judgment
on their premises liability claim, the Petersons were required to establish
that:  (1) RES was a possessor of the property; (2) RES knew[8]
or should have known of a dangerous condition on the premises; (3) the
condition presented an unreasonable risk of harm; and (4) the condition
proximately caused Peterson’s injuries.  See Brinson Ford, Inc. v. Alger,
228 S.W.3d 161, 162 (Tex. 2007) (citing Seideneck v. Cal Bayreuther Assocs.,
451 S.W.2d 752, 754 (Tex. 1970)); see also Shell Oil Co. v. Khan, 138
S.W.3d 288, 291-92 (Tex. 2004) (noting that a general contractor owes the same
duty as a premises owner to an independent contractor’s employee); Koch Ref.
Co. v. Chapa, 11 S.W.3d 153, 155 (Tex. 1999).  When a general contractor
knows or should have known of a dangerous condition on the premises, it is
required to “take whatever action is reasonably prudent under the circumstances
to reduce or to eliminate the unreasonable risk from that condition.”  TXI
Operations, L.P. v. Perry, 278 S.W.3d 763, 764-765 (Tex. 2009) (citing Corbin
v. Safeway Stores, Inc., 648 S.W.2d 292, 295 (Tex. 1983)).

A general contractor
is considered a “possessor” of the property at issue if it retains the right of
supervisory control over work on the premises.  See Coastal Marine Serv. of
Tex., Inc. v. Lawrence, 988 S.W.2d 223, 225-26 (Tex. 1999) (citing Clayton
W. Williams, Jr., Inc. v. Olivo, 952 S.W.2d 523, 527 (Tex. 1997)); Thornhill
v. Ronnie’s I-45 Truck Stop, Inc., 944 S.W.2d 780, 788 (Tex. App.—Beaumont
1997, writ denied).  “In determining whether an owner has retained this right
to control, the standard is narrow.  The right to control must be more than a
general right to order work to stop and start, or to inspect progress.”  Coastal
Marine Serv., 988 S.W.2d at 226.  The supervisory control must relate to
the activity that actually caused the injury, and grant the general contractor at
least the power to direct the order in which work is to be done or the power to
forbid it being done in an unsafe manner.  See id. (citing Olivo,
952 S.W.2d at 528; Exxon Corp. v. Tidwell, 867 S.W.2d 19, 23 (Tex.
1993); Redinger, 689 S.W.2d at 418).  “There must be such a retention of
a right of supervision that the contractor is not entirely free to do the work
in his own way.”  Koch
Ref. Co.,
11 S.W.3d at 155 (citing Restatement
(Second) of Torts § 414 cmt. c (1965)).

A party can prove the
right to control in two ways:  first, by evidence of a contractual agreement
which explicitly assigns the general contractor a right to control; and second,
by evidence that the general contractor actually exercised control over the
job.  See id. (citing Olivo, 952 S.W.2d at 528).  Generally, the
former is a question of law for the court and the latter is a question of fact
for the jury.  Shell Oil Co., 138 S.W.3d at 292.  The Petersons argue
both theories.

First, the Petersons
argue that the contract executed by RES and Gulf Wind “clearly establish[es]
that RES had a right to control the property.”  They also point to the “Site
Passport” issued by RES which requires, among other things, that “[a]ll climbing
and lifting equipment must be inspected every day before use and defective
equipment replaced immediately.”  However, a contract requiring independent
contractors to comply with general safety practices and train their employees
to do so does not constitute a right to control job-site safety.  Id. at
293-94 (citing Dow Chem. Co. v. Bright, 89 S.W.3d 602, 611 (Tex. 2002) (finding
no right to control raised by allegation that subcontractor’s employees were
required to be “indoctrinated” with general contractor’s safety rules); Hoechst-Celanese
Corp. v. Mendez, 967 S.W.2d 354, 357-58 (Tex. 1998) (finding no right to
control in contractual provision requiring contractor to train its employees in
general contractor's safety-related rules and regulations)).  Instead,
requiring subcontractors’ employees to learn and follow general safety
procedures subjects an owner only to a “narrow duty to avoid increasing the
risk of injury.”  Id.  (citing Koch Ref. Co., 11 S.W.3d at 156; Hoechst-Celanese
Corp., 967 S.W.2d at 357-58).  Here, the Petersons did not allege or
present evidence that the RES’s promulgation of safety rules and regulations in
the main contract or site passport increased any risk of injury to Peterson.  See
id.  Moreover, as noted by RES, the main contract specifically excluded the
work Peterson was doing at the time he was injured—installation of
instrumentation on met masts—from the description of RES’s scope of work.  We
conclude that there is no evidence that RES retained a contractual right of control
over DNV or Peterson with respect to the activity Peterson was engaged in at
the time of his injuries.

The Petersons further
argue that, regardless of the contracts, the conduct of RES “shows that they
exercised actual control of the premises.”  They point specifically to:  the
“Site Passports”; RES’s “Illness and Injury Prevention Program”; Elizondo’s
deposition testimony in which he stated that RES was “the boss,” it was “their
site,” and he followed “their rules”; Fowler’s testimony that RES “supervised”
the construction of the roads leading to the met tower staging site and that
all subcontractors were instructed “not to go in the wetlands”; the work permit
issued to Ionos dated January 30, 2009; and the minutes from the safety meeting
held on October 22, 2008.  We find that none of these constitute evidence that
RES “actually exercised control over the job.”  See Coastal Marine Serv.,
988 S.W.2d at 226.  The site passports do not list any rules arguably
applicable to the proper staging of met towers.  The “Illness and Injury
Prevention Program” applied only to RES employees, and so could not establish a
right of control over independent contractor employees such as Peterson.  While
Elizondo did state that RES was “the boss,” he agreed that “RES didn’t at all
get involved in the actual work that you were doing out there in terms of the
erection of the [met] towers.”  The 2009 work permit was not evidence that RES
retained a right to control DNV’s or Peterson’s work as of November 9, 2008,
when the injury occurred.  The safety meeting minutes noted that all
subcontractors were required to “identify staging areas” but do not establish
that RES actually retained the right to control where the staging areas were
located.  Finally, although RES may have “supervised” road construction, and
that road construction may have led to the improperly-staged met tower, that is
not enough under the applicable law to establish that RES was a “possessor” of
the property such that it would be liable under a premises defect theory.  See
Koch Ref. Co., 11 S.W.3d at 155 (noting that the right of control must be
such “that the contractor is not entirely free to do the work in his own way”);
Coastal Marine Serv., 988 S.W.2d at 226 (noting that the right of
control “must relate to the activity that actually caused the injury”).

We conclude that the
trial court did not err in granting RES’s no-evidence summary judgment motion
with respect to the Petersons’ premises liability claim.  See Tex. R. Civ. P. 166a(i).  Issue one is
overruled.

C.        Negligence
and Negligent Undertaking

            By their
second issue, the Petersons contend that they produced more than a scintilla of
evidence establishing RES’s liability under traditional negligence and
negligent undertaking theories.  Again, we disagree.

            A general
contractor generally owes no duty to ensure that its independent contractors
perform their work in a safe manner.  Gen. Elec. Co. v. Moritz, 257
S.W.3d 211, 214 (Tex. 2008).  However, as with a premises liability claim, one
who retains a right to control the contractor’s work may be held liable for
negligence in exercising that right.  Id.  Here, we have already
determined that the Petersons have not met their burden to produce evidence
raising a genuine issue of material fact as to whether RES retained a right to
control DNV’s or Peterson’s work.  Accordingly, no-evidence summary judgment in
favor of the RES entities on the Petersons’ traditional negligence claim was
proper.  See Tex. R. Civ. P.
166a(i).

            We
further conclude that the Petersons have not met their burden with respect to
their claim of negligent undertaking.  Under that theory,

[o]ne who undertakes, gratuitously or
for consideration, to render services to another which he should recognize as
necessary for the protection of the other’s person or things, is subject to
liability to the other for physical harm resulting from his failure to exercise
reasonable care to perform his undertaking, if 

 

(a)         
his failure to
exercise such care increases the risk of such harm, or

            

(b)         
the harm is
suffered because of the other’s reliance upon the undertaking.

 

Torrington Co. v.
Stutzman,
46 S.W.3d 829, 839 (Tex. 2000) (citing Restatement
(Second) of Torts § 323 (1965)).  The Petersons alleged specifically
that RES undertook the job of building the road that led to the met tower
staging area, that they did the job negligently, and that this led to
Peterson’s injuries.  Without considering whether evidence was produced that
RES was negligent in constructing the road or whether Peterson relied on RES’s
performance in that regard, we find that the faulty nature of the road was not
a proximate cause of Peterson’s death.  The Petersons essentially assert that
the condition of the road was so poor, and its dimensions so narrow, that it
was insufficient to support the weight of the crane that was to be used for
constructing the met towers, and the met towers therefore had to be staged in a
soft, grassy area, which led to Peterson’s fall.  However, it was Ionos that
actually decided to place the met tower sections on the unstable patch of
land.  Moreover, there is no evidence that Ionos was incapable of contacting
RES to inform it that no safe staging area was available for the met tower
sections, or to request that it reconstruct or reconfigure the road to make it
suitable for those purposes.

Under these
circumstances, we agree with RES that, at most, RES’s conduct in building the
road merely furnished the condition that made Peterson’s injury possible, which
is insufficient to establish legal cause.  See Roberts v. Healey, 991
S.W.2d 873, 878 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (“Cause in
fact does not exist if the defendant’s negligence does no more than furnish a
condition which made the injury possible.”) (citing Union Pump Co. v.
Allbritton, 898 S.W.2d 773, 776 (Tex. 1995)); see also Transcont’l Ins.
Co. v. Crump, 330 S.W.3d 211, 224 (Tex. 2010) (“[F]or an act or event to
rise to the level of cause in the legal sense, the act or event must be such
that reasonable jurors would identify it as being actually responsible for the
ultimate harm.  The cause must be more than one of the countless ubiquitous and
insignificant causes that in some remote sense may have contributed to a given
effect as, for example, simply getting up in the morning.”).

We conclude that the
trial court did not err in granting no-evidence summary judgment to all three RES
entities on the Petersons’ negligent undertaking claim.[9] 
See Tex. R. Civ. P.
166a(i).  The Petersons’ second issue is overruled.

III. 
Conclusion

            Having
overruled the Petersons’ two issues, we affirm the judgment of the trial court.

 

                                                                                                DORI
CONTRERAS GARZA

Justice

 

Delivered and
filed the 

30th day of June,
2011.









[1]
All three appellees will be referred to collectively as “RES.”

 





[2]
An anemometer is an instrument used to measure the force or speed of wind.  Merriam Webster’s Collegiate Dictionary
44 (10th ed. 1996).

 





[3]
The other named defendants are:  Ionos Communications; SNET, L.L.C. d/b/a
Southern Networks and Southern Networks, L.L.C.; Richard Elizondo d/b/a Ionos
Communications; AJM Group, LLC; Arnold Quintanilla d/b/a AJM Group, LLC; and
Gravitec Systems, Inc.  None of these entities are parties to this appeal.

                            





[4]
One of the hybrid summary judgment motions was filed by appellees RES-AC and
RES-A; the other was filed by appellee RES-C.





[5]
The contract defined the “Project” as:

 

the integrated
wind-powered electric generating facility . . . to be
located on the Project Site, consisting of all foundations, structures,
facilities, appliances, lines, [t]ransformers, WTGs [wind turbine generators],
conductors, instruments, equipment, apparatus, components, roads and other
property comprising and integrating the entire facility described generally in
the Scope of Work and the Technical Specifications.

 

The “Scope of Work” was
defined as

 

the services and
work to be provided, or caused to be provided, by or through [RES-C] under this
Agreement for the Contract Price, as more specifically described in Exhibit A
and the Technical Specifications, as the same may be amended from time to time
in accordance with the terms hereof.

 

Part A of Exhibit A to the
agreement listed specific tasks that are included in the scope of work.  Part B
of Exhibit A states that, “[n]otwithstanding any conflicting statement in Part
A of Exhibit A or elsewhere in the Agreement, the following items are not included
in [RES-C]’s Scope of Work,” and includes the following:

 

18.        CONTRACTOR
EXCLUSIONS – MET MASTS/POWER CURVE TESTING

 

18.1      General

 

(i)            
Procurement and installation of met masts and instrumentation needed for
the temporary and permanent metrological [sic] towers.

      

(ii)           
Temporary power to met masts

 

(iii)          
Site calibration

 

(iv)         
Power curve testing

 

(v)          
Met tower FAA lights

 





[6]
This argument, regarding the definition of RES’s “Scope of Work,” was also
advanced by RES-AC and RES-A in the first summary judgment motion.

 





[7]
Many of these deposition transcripts, as they appear in the record before this
Court, are missing critical pages.  Moreover, several of the transcripts appear
to have pages cobbled together haphazardly from different depositions.  We will
consider the deposition transcripts in our analysis only insofar as we can make
sense of them.





[8]
There was no evidence presented that RES had actual knowledge of the
defect at issue prior to Peterson’s accident.





[9]
We need not address the Petersons’ contention that “each of the various RES
entities as the RES companies are vicariously liable for the conduct of the
limited partner, in this case, [RES-C], through the theory of joint
enterprise,” because, even if RES-A and RES-AC were vicariously liable, we have
already determined that no-evidence summary judgment in favor RES-C was proper
with respect to all of the Petersons’ claims.