In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-16-00386-CV**
_____


**CRESCENT TERMINALS, LLC Appellant**

**V.**

**SAYBOLT, LP, Appellee**

On Appeal from the 136th District Court
Jefferson County, Texas
Trial Cause No. D-194,189

**MEMORANDUM OPINION**

Crescent Terminals, LLC appeals from a summary judgment ruling in favor

of Saybolt, LP, who was employed to act as Crescent's and ExxonMobil Oil

Corporation's (Exxon) mutually agreed inspector to evaluate the quality of a cargo

of crude oil that Crescent sold to Exxon. Crescent raises three issues in its appeal of

the trial court's take-nothing judgment, arguing the summary judgment evidence

1

reveals the existence of fact issues on the breach of fiduciary duty, tortious interference with contract, and business disparagement claims that it filed against Saybolt. We affirm the trial court's judgment.

## Background

In June 2012, Crescent agreed to sell 100,000 barrels of crude oil to Exxon. The transaction was based on a written agreement, contract number 1470, which includes terms that specify the quality of the cargo. One of the terms of the contract required that Crescent's cargo of crude oil "be marketable and acceptable in the applicable common or segregated stream of the carriers involved but not to exceed 1% S[ediment] & W[ater]." The contract also required that Crescent deliver the cargo to a storage tank facility operated by Sunoco Partners Marketing & Terminals, L.P. (Sunoco) in Nederland, Texas. Crescent filed suit against Exxon and later sued Saybolt when Saybolt reported that the sediment and water content of the cargo that Crescent delivered in discharging its duties under contract 1470 exceeded one percent.

The summary judgment evidence reflects that Crescent discharged the cargo from barges into storage tanks that Exxon leased from Sunoco. Several other provisions that are in contract number 1470 are relevant to the trial court's resolution of Saybolt's motion. For instance, the contract required the cargo that Crescent

2

delivered to Exxon to be inspected for quantity and quality by a "mutually agreed independent inspector, with costs to be shared equally." The contract also provides that the inspection "shall be as specified by [Exxon], but not to exceed the quality warranties contained in this contract and shall be based on composite vessel sample or automatic inline sampler prior to discharge, unless otherwise mutually agreed in writing."

Saybolt is the company that Crescent and Exxon chose to use as their mutually agreed inspector with respect to contract number 1470. When Saybolt performed its duties to inspect Crescent's cargo, its employees performed tests to determine the sediment and water content on samples that its employees obtained from the barge as it was being discharged and from samples that Sunoco's representatives gathered from Sunoco's automatic inline sampler during Crescent's discharge of its cargo. The tests on the samples taken from the two sources were significantly different, as the samples tested from the automatic inline sampler showed that Crescent's cargo failed to comply with the less than one percent sediment and water requirement that is in contract number 1470.[1] Had Saybolt based its final discharge report regarding

---

[1] Saybolt's final discharge report reflects that Crescent's cargo, delivered to Exxon under contract number 1470, contained approximately fourteen percent sediment and water, by volume.

Crescent's cargo on the tests Saybolt performed on the composite vessel samples, its report would have indicated that the cargo contained less than one percent water and sediment, by volume. Viewed in the light most favorable to Crescent, the summary judgment evidence established that Saybolt based its final discharge report on the tests that it performed on the samples that came from Sunoco's automatic inline sampler because Exxon directed Saybolt's manager to issue its report based on its testing of those samples.

In 2013, Crescent sued Exxon because Exxon had based the payment that it made to Crescent for the cargo delivered pursuant to contract number 1470 on Saybolt's report showing that the cargo contained more than one percent sediment and water, by volume.[2] In 2014, Crescent added Saybolt as another party to its suit. In Crescent's second amended petition (the live pleading before the trial court at the time that it ruled on Saybolt's motion) Crescent alleged that Saybolt owed it a fiduciary duty regarding the numbers it chose to report to Exxon regarding the water and sediment in the cargo it sold to Exxon, and that it had breached its duties to Crescent by providing Exxon with a final discharge report that Saybolt based on the

---

[2] Before the trial court ruled on Saybolt's motion for summary judgment, Crescent nonsuited its claims against Exxon. Therefore, Exxon was not a party to the case when the trial court ruled on Saybolt's motion, and it is also not a party to the appeal.

4

tests that it had performed on the samples taken from Sunoco's automatic inline sampler. According to Crescent, Saybolt's report should have been based on the composite vessel samples that its employees took during the discharge of the cargo, or Saybolt should have issued a report stating that no final report could be issued given the discrepancies in the tests that it did on all of the samples that it tested. In addition to its breach of fiduciary duty claim, Crescent asserted a claim against Saybolt for tortious interference with its relationship with Exxon, for falsely disparaging Crescent's business practices, for fraud, and for conspiring with Exxon to damage Crescent's business.

On appeal, Crescent filed a brief that challenges the rulings the trial court made on Crescent's breach of fiduciary duty, tortious interference, and business disparagement claims. Crescent does not challenge the trial court's rulings on Crescent's fraud and civil conspiracy claims.

Saybolt challenged the claims that are the subject of Crescent's appeal by filing a combined traditional and no-evidence motion for summary judgment. In response to Saybolt's combined motion, Crescent filed a response, and it attached several exhibits for the trial court to consider in evaluating Saybolt's request. The exhibits that Crescent filed, and that the trial court considered, are comprised of three

affidavits and one unsworn declaration;[3] excerpts from three depositions taken by

the parties in the discovery phase of the case;[4] a copy of an e-mail that Brian Goff,

a Saybolt employee, sent to David Sifuentes and Alyssa Fritz, Exxon employees,

which explains that Saybolt's tests on the composite vessel samples showed that the

---

[3] Crescent's response includes affidavits and an unsworn declaration from the following witnesses: (1) David Robinson, who indicated that he was familiar with the automatic inline sampler used at Sunoco's terminal, and that the system could sample a barge in a manner that could "lead to false indications of high water[;]" (2) Jacob Feldman, a former employee of Crest Energy Partners, L.P., which refuted allegations by Exxon in its counterclaim that the product Crescent delivered to Sunoco's terminal in June 2012 had been mixed with slop oil that Crest purchased in June 2012 from another refinery; (3) Annette Kroll, an authorized representative of Exxon, who indicated that Exxon paid for the oil it received from Crescent based on the automatic inline sampler results, which she asserted "were not erroneous[;]" and (4) the affidavit of Paxton Crew, an attorney for Crescent, who verified that the documents other than the affidavits and unsworn declaration consisted of true and correct copies of documents that Crescent obtained during discovery in the litigation of its claims.

[4] The deposition transcripts that Crescent included as exhibits to its motion consist of excerpts from the testimony taken from: (1) Brian Hudgins, who indicated that in August 2012, he requested additional tests be performed on barge samples that Saybolt had retained that were relevant to Crescent's July crude oil delivery to Sunoco's terminal; (2) Annette Kroll, who indicated that the statements that she made in her affidavit had been based on information that was provided to her by representatives of Saybolt; and (3) Brian Mayo, an Exxon employee, who testified that he did not know exactly how much of the oil that came from a specific Crescent barge had been mixed with the oil in the barges that Crescent discharged in July 2012 into Sunoco's tanks.

crude oil cargo contained less than one percent sediment and water, by volume;[5] a

copy of an e-mail dated August 15, 2012, from Don Martin, the assistant manager

of Saybolt, to Adam Reeves, an employee of an entity identified as HMG Americas,

which indicates that the automatic sampling system at Sunoco's terminal could not

produce records that would allow the results produced by Sunoco's system to be

validated;[6] a copy of an e-mail from Brian Goff, of Saybolt, to Annette Kroll, of

Exxon, dated August 8, 2012, explaining why the composite vessel samples obtained

by Saybolt's inspectors on Crescent's barges might not have accurately reflected the

sediment and water content of the crude in the cargo;[7] copies of Saybolt's discharge

---

[5] Goff's e-mail also states that when the cargo pertinent to contract number 1470 was transferred to Exxon, "it shut down the unit due to high water content. Testing of the auto line revealed water content to be 14%, auto line report does not indicate failure. Please advise if you would like to issue figures using autoline analysis or using barge composite."

[6] Martin's e-mail states that he had "spoken with the terminal and this [automatic inline] system has no proof of performance. They cannot produce any sort of records pertaining to the validity of the system."

[7] In pertinent part, Goff's e-mail to Kroll states that the samples that Saybolt retained from the composite vessel samples that its employees obtained from Crescent's barges "have been sitting undisturbed for two days now and the water has still not separated, the water in the bottom looks like an emulsion. This high water content – emulsified liquid would not be fully represented in our running averages from the barge/shore, as manual samplers can only get within 10 inches of the bottom. The terminal would like to use the autoline for outturn figures. The terminal was involved in this investigation and their findings are in line with ours. This crude has displayed some rather odd characteristics. No hard copy of the performance

reports on the crude oil cargo that Crescent's barges discharged at Sunoco's docks in August 2012; copies of the evidence Saybolt produced in response to Crescent's request for production; a copy of the International Federation of Inspection Agencies' (IFIA) Petroleum and Petrochemical Bulletin 14-03, dated December 2014;[8] a copy of information from Saybolt's internet website, dated November 2015, which reflects that in 2004, Saybolt adopted the IFIA Compliance Code; a copy of Exxon/Crescent contract number 1470, which indicates that Exxon had the right under contract number1470 to specify the quality inspections required under contract number 1470; and a copy of contract number 5211, an agreement between Crescent and Exxon dated August 2012, which concerns another Crescent cargo.[9]

report can be issued as this was [brand] system and does not have printout capabilities. The digital readout is approved by a trained inspector and verified by appropriate terminal personnel."

[8] Among other things, IFIA's bulletin indicates that when disagreements arise in situations where inspection services have been provided to multiple parties to the same commercial transaction, the inspection company is not generally a party to the delivery contract, and the commercial transaction is governed by the contract that exists between the buyer and the seller. The bulletin recommends that when disagreements between the parties to a commercial transaction occur, the inspection company may not be in a position to provide a final and conclusive report. The bulletin concludes by suggesting that in response to such situations, the inspection company issue a report that details the events of the inspection and details the dispute "but without drawing a conclusion."

[9] The response that Crescent filed to Saybolt's combined motion failed to explain how contract number 5211 was relevant to its arguments. However, all of

Following a hearing on Saybolt's traditional and no-evidence motions, the trial court granted both motions. The trial court rendered an interlocutory summary judgment order stating that Crescent is to "take nothing by its breach of fiduciary duty, tortious interference, and business disparagement claims against Saybolt."[10] The trial court's initial order did not resolve Crescent's fraud or conspiracy claims. Subsequently, Crescent asked the trial court to reconsider its ruling on Saybolt's motion. Crescent attached additional evidence to its motion to reconsider, which

_____

the Exxon/Crescent contracts that were included by the parties in their motions and responses appear to essentially be form contracts. They all contain the same language that requires independent inspections for quantity and quality of crude oil cargoes, and all indicate that the costs of inspection are to be shared equally. All of the contracts provided: "All quality inspections shall be as specified by [Exxon], but not to exceed the quality warranties contained in this contract and shall be based on composite vessel sample or automatic inline sampler prior to discharge, unless otherwise mutually agreed in writing."

[10] The order granting Saybolt's combined traditional and no-evidence motion for summary judgment adopts and incorporates by reference a letter the trial court sent the parties explaining why it decided to grant Saybolt's combined motion. To the extent the trial court's letter might be argued to constitute findings of fact or conclusions of law, the contents of the letter are not germane to our resolution of Crescent's appeal. *See Gardner v. Abbott,* 414 S.W.3d 369, 380 (Tex. App.—Austin 2013, no pet.) (holding that when the trial court does not state the grounds on which it grants a summary judgment, an appeals court can affirm on any theory presented to the trial court and preserved for appeal, and holding that a trial court's precise legal conclusions are not essential or germane to the disposition of an appeal from a summary judgment because the grounds for granting a summary judgment motion are limited to those grounds specified in the motion, and such judgments are reviewed de novo).

9

consists of excerpts from the depositions of Annette Kroll and Homer Williams,[11] and Exxon/Crescent contract number 1868, a contract between Crescent and Exxon that required Crescent to deliver 150,000 barrels of crude oil to Exxon on or before September 10, 2012. Crescent explained that Exxon/Crescent contract number 1868 was the last contract that Exxon made with Crescent, and that the parties had entered into that contract before the dispute arose involving the crude oil delivered under contract number 1470. According to Crescent, once the dispute regarding its delivery under contract number 1470 arose, Exxon "cancelled all of its existing contracts with Crescent."

The excerpts from Kroll's deposition reflect that Kroll testified that she relied on information provided to her by Saybolt in reaching her opinion about the accuracy of the automatic inline sampler results involving contract number 1470. The excerpts from Williams's deposition indicate that Saybolt considered both Exxon and Crescent to be its clients with respect to the services that Saybolt provided on the cargo that led to Crescent's filing of a lawsuit.

---

[11] Williams identified himself in his deposition as Saybolt's regional manager.

In September 2016, the trial court rendered a final take-nothing judgment in Saybolt's favor on all of Crescent's claims. Subsequently, Crescent timely perfected its appeal from the final judgment.

Standard of Review

We review the rulings of a trial court on motions for summary judgment under a de novo standard. *See Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex. 2003). When the trial court grants a combined traditional and no-evidence motion, the trial court's rulings on the no-evidence part of the combined motion are considered first by the appellate court in its review. *See Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 600 (Tex. 2004). The rule of procedure that applies to no-evidence motions, Rule 166a(i) of the Texas Rules of Civil Procedure, provides that a court may rule on a no-evidence motion for summary judgment after the party opposing the motion has had an adequate time to engage in discovery on the claims that are being challenged by the motion. Tex. R. Civ. P. 166a(i). Under Rule 166a(i), the trial court "must grant the motion unless the respondent produces summary judgment evidence raising a genuine issue of material fact" on the challenged elements of the respondent's respective claims. *Id*. The Texas Supreme Court has explained that the trial court must grant a no-evidence motion if "(a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law

11

or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact." *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex. 2003). Because a trial court's decision to grant a no-evidence motion for summary judgment is essentially a pretrial directed verdict, "we apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict." *Id.* at 750-51.

In its appeal, Crescent challenges the trial court's rulings on its breach of fiduciary duty, tortious interference, and business disparagement claims. Therefore, we review the trial court's no-evidence rulings on these three claims before we review the trial court's rulings on those same claims under the traditional sections of Saybolt's motion. *See Ridgway,* 135 S.W.3d at 600.

Fiduciary Duty

In issue one, Crescent argues that Saybolt acted as Crescent's and Exxon's joint agent with respect to reporting the water content included in the cargo of crude oil that Crescent delivered to Exxon in discharging its obligations under contract number 1470. According to Crescent, because Saybolt was acting as a joint agent in reporting the qualities of the cargo in Crescent's barges, Saybolt owed Crescent a fiduciary duty to "exercise good faith and fair dealing" in discharging its inspection

12

because in generating a report it knew that Exxon would rely on the report to determine whether the cargo met the requirements in contract number 1470. In response, Saybolt argues that Crescent provided the trial court with no evidence that Saybolt owed a fiduciary duty with respect to providing a report based solely on its testing of the composite vessel samples that its employees obtained from Crescent's barge. Saybolt further contends that it was not required to refuse Exxon's request that it base its final discharge report on the tests its employees performed on the samples obtained by Sunoco's automatic inline sampler.

To determine whether Saybolt breached any fiduciary duties that it owed Crescent with respect to the method that it used in preparing its final discharge report on the cargo at issue, we look to Saybolt's relationship with Crescent, which was formed as the result of the requirements found in contract number 1470. *See generally Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co.,* 235 S.W.3d 695, 702-03 (Tex. 2007) (considering the written agreement between the parties in determining the extent of an independent contractor's duties); *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 513 (Tex. 1942) (looking to the negotiations that led to the consummation of a contract in determining whether a fiduciary relationship existed and whether a violation of a fiduciary duty occurred). Contract number 1470 provides for an "[i]ndependent inspection for quantity and quality,"

13

and required the inspection to be "performed by a mutually agreed independent inspector, with costs to be shared equally." The language in the contract expressly allowed for samples to be gathered by two methods in the inspection of the cargo, and the contract specifically allowed the inspection to "be as specified by [Exxon] . . . unless otherwise mutually agreed in writing." In the absence of evidence that Crescent and Exxon mutually agreed to alter the provision allowing Exxon to specify the method used in the inspection of Crescent's cargo, Crescent's contract with Exxon authorized Exxon to direct Saybolt as to the method it was to use in preparing its final report, and Exxon chose one of the methods allowed by the contract. Based on our review of the summary judgment evidence, we find that the record does not include any evidence showing that Crescent and Exxon agreed to change the provisions in contract number 1470 in a way to prevent Exxon from directing Saybolt to base its final discharge report on the samples that it tested from Sunoco's automatic inline sampler.

Crescent also suggests that in Saybolt's discharge of its responsibilities to Exxon and Crescent, Saybolt was required to perform its inspection and report its results "under high equitable standards, and at a minimum exercise good faith and fair dealing with the parties." However, our review of the summary judgment evidence indicates that Crescent produced no evidence to show that Saybolt failed

14

to properly analyze the samples that it tested that were all taken from Crescent's cargo. Given the language in the contract between Crescent and Exxon that allowed Exxon to specify the quality inspection method to be used for the inspection of the cargo at issue, together with the fact that there was no evidence to show that Exxon and Crescent agreed to alter that provision, we conclude that Crescent produced no evidence to establish that Saybolt had a fiduciary duty to reject Exxon's request that it report the results of its inspection contrary to the method chosen by Exxon. We further conclude that the summary judgment evidence conclusively established that Saybolt had the right to allow Exxon to direct that Saybolt base its final discharge report on the sample method that Saybolt used to prepare its final report on Crescent's cargo. *See Nat'l Plan Adm'rs*, 235 S.W.3d at 704 ("Whether a party owes a fiduciary duty is a legal matter."); *Chapman*, 118 S.W.3d at 751 (stating that a no-evidence motion should be granted "if the evidence conclusively establishes the opposite of the vital fact"). We overrule Crescent's first issue.

Tortious Interference and Business Disparagement

For convenience, we address issue three next. *See* Tex. R. App. P. 47.1 (allowing the court of appeals to limit its discussion of the issues to resolving the issues that are necessary to the court's final disposition of the appeal). In issue three, Crescent challenges the trial court's decisions granting Saybolt's motion on its

15

tortious interference and business disparagement claims. We address both of these claims together because Crescent grouped its complaints about the trial court's resolution of these claims in a single issue.

In issue three, Crescent argues that "[t]he same conduct whereby Saybolt breached its fiduciary duties to Crescent . . . also amount to tortious interference with the Crescent/ExxonMobil contract and business disparagement." According to Crescent, Saybolt's report and communications with Exxon regarding the water content of the oil that Crescent sold to Exxon in discharge of its contractual obligations under contract number 1470 caused Exxon to cancel other contracts that it had with Exxon under which Exxon had agreed to purchase Crescent's oil.

To prevail on its claim for tortious interference, Crescent would be required to prove that a material issue of fact existed on whether (1) Crescent had a contract with Exxon, (2) Saybolt willfully and intentionally interfered with that contract, (3) the tortious interference proximately caused Crescent's damages, and (4) Crescent suffered actual damage or loss due to the Saybolt's interference with Crescent's contract with Exxon. *See Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 689 (Tex. 2017) (citing *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002)). Proving a claim for business disparagement would require Crescent to prove (1) Saybolt published false and disparaging information about

16

Crescent (2) with malice, (3) without privilege, and (4) that Saybolt's publication of the false or disparaging information caused Crescent to suffer damages. *See Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003).

Saybolt challenged each of the elements of these two claims in its no-evidence motion for summary judgment. On appeal, Crescent argues that its summary judgment evidence demonstrated that a material issue of fact exists regarding whether Saybolt tortiously interfered with its relationship with Exxon based on the obligations that Exxon had under contract number 1868, a contract between Crescent and Exxon requiring Exxon to purchase 150,000 barrels of crude oil from Crescent and to deliver the oil in September 2012. To establish that Saybolt published false and disparaging information and willfully and intentionally interfered with Crescent's rights under contract number 1868, Crescent relied on evidence showing that Saybolt communicated with Exxon about the water content in the cargo delivered under contract number 1470 and that Saybolt provided Exxon with a final discharge report indicating the oil Crescent sold to Exxon did not meet Exxon's specifications.

Generally, "'a [defendant] must be a stranger to a contract to tortiously interfere with it.'" *In re Vesta Ins. Group, Inc.*, 192 S.W.3d 759, 761 (Tex. 2006) (quoting *Morgan Stanley & Co., Inc. v. Tex. Oil Co.*, 958 S.W.2d 178, 179 (Tex.

17

1997)); *see also Holloway v. Skinner,* 898 S.W.2d 793, 794-95 (Tex. 1995). "'[A defendant] cannot tortiously interfere with its own contract.'" *Vesta Ins. Group,* 192 S.W.3d at 761 (quoting *Holloway,* 898 S.W.2d at 796). In this case, contract number 1470, the contract that governed Crescent's August 2012 delivery of oil, required that Crescent's cargo be inspected for quantity and quality by a "mutually agreed independent inspector, with costs to be shared equally." Saybolt acted as Exxon's and Crescent's joint agent with respect to the duties created by contract number 1470. Therefore, the evidence conclusively established that in its dealings with Exxon with respect to contract number 1470, Saybolt was not a stranger to the contract.

Moreover, our review of the summary judgment evidence reflects that Crescent produced no evidence to show that Saybolt communicated with Exxon regarding Crescent's other business dealings with Exxon, including any dealing that Exxon and Crescent had under contract number 1868. And, there is no evidence in the summary judgment record showing that Saybolt willfully or intentionally interfered with Crescent's rights under contract number 1868. Instead, all of the acts Crescent relies upon for its tortious interference claim is conduct that Saybolt committed in discharging its duties to Exxon and Crescent as their joint agent under contract number 1470. *See Cmty. Health Sys. Prof'l Servs. Corp.*, 525 S.W.3d at 689

(citing *Butnaru*, 84 S.W.3d at 207). Consequently, we conclude that the record does not contain any evidence to show that Saybolt willfully and intentionally interfered with any rights Crescent had based on any other contracts that it might have had with Exxon. *See Browning-Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 927 (Tex. 1993) (explaining that to satisfy the element of willful and intentional interference a party must knowingly induce one of the contracting parties to breach its obligations).

With respect to Crescent's business disparagement claim, our review of the summary judgment evidence reveals that Crescent provided the trial court with no evidence to show that (1) Saybolt published false and disparaging information about Crescent, (2) with malice, and (3) without privilege. *See Forbes Inc.*, 124 S.W.3d at 170. Saybolt challenged each of these elements of Crescent's business disparagement claim in its no-evidence motion. The Texas Supreme Court has held that "a business disparagement defendant may be held liable 'only if he knew of the falsity or acted with reckless disregard concerning it, or *if he acted with ill will or intended to interfere in the economic interest of the plaintiff in an unprivileged fashion.'" Id.* (quoting *Hurlbut v. Gulf Atl. Life Ins. Co.,* 749 S.W.2d 762, 766 (Tex. 1987)). None of the summary judgment evidence in the record shows that Saybolt knew that its test results on the samples it obtained from Sunoco's automatic inline sampler were false. Crescent also produced no evidence in response to Saybolt's

19

motion to show that Saybolt published disparaging words about the quality of any of Crescent's cargoes other than the cargo that Crescent delivered under contract number 1470. Finally, Crescent failed to present any evidence to prove that Saybolt's communications with Exxon regarding the quality of the crude oil delivered under the terms of contract number 1470 had been false, or evidence showing that the communications that Saybolt had with Exxon were either malicious or unprivileged. *Id.*

We conclude the trial court properly granted Saybolt's no-evidence motion. We overrule issue three. Given our conclusions that no evidence was presented to establish that Saybolt owed or breached any fiduciary duty that it owed to Crescent, that no evidence was presented to establish that Saybolt tortiously interfered with Crescent's business relationship with Exxon, and that no evidence was presented to establish that Saybolt acted with ill will or intended to interfere with Crescent's economic interest with Exxon in an unprivileged fashion, we need not reach the arguments that Crescent presents in its second issue, which contends that the summary judgment evidence raised issues of material fact on whether Saybolt's acts and omissions caused Crescent to be damaged. Tex. R. App. P. 47.1. Accordingly, the trial court's judgment is affirmed.

AFFIRMED.

_____
HOLLIS HORTON
Justice

Submitted on September 11, 2017
Opinion Delivered February 8, 2018

Before McKeithen, C.J., Horton and Johnson, JJ.

21